HUTCHINSON VS. THE CHICAGO & NORTHWESTERN RAILWAY
COMPANY.

DEED. *Of indenture, or poll.* (1, 2) *When binding on grantee.* (4) *The phrase, " the structure which now sustains mill dam," construed.*

GRIST MILL. (5) *Name defined.* (1, 7) *Contract construed.*

INSTRUCTIONS. (8) *Held inconsistent and erroneous.*

DAMAGES. (9) *For depreciation in value caused by breach of contract. Rule stated.* (10, 11) *How jury to assess.*

1. It is the settled law of this state, that a deed of conveyance executed by the grantor only is binding upon the grantee after acceptance, whether it be a deed of indenture or a deed poll.

2. Plaintiff signed and sealed a contract whereby, for himself, his heirs, etc., he covenanted and agreed with the defendant company to sell and convey to it, on demand, for a railroad track, the fee simple of a strip of land one hundred feet wide through certain premises, being a mill property of plaintiff, with this proviso: "provided said railroad track shall not interfere with or injure the structure which now sustains my mill dam, and not to run nearer than seven rods from the east line of my grist mill." This contract, duly witnessed and acknowledged, was delivered to defendant, and by it accepted and registered; and the company entered upon the land under it, and built its road thereon. *Held*, that defendant is bound by the conditions of the contract.

[3. What would have been the relation of the parties if defendant, in building its road, had avoided plaintiff's premises, or undertaken to secure the right of way over them by condemnation under its charter, it was not necessary to determine in this action.]

4. The phrase, "the structure which now sustains my mill dam," construed to mean the structure constituting the dam itself; there being no structure not constituting part of the dam, to which the words can be applied.

5. It appears from the evidence that there are (and were at the time of the execution and acceptance of said contract) *two* mills of plaintiff on said premises, lying easterly and westerly, within a few feet of each other; the westerly one constructed and used with bolting apparatus to grind wheat; the easterly, without bolting apparatus, to grind coarse grains; both for customers bringing their own grain to be ground for their own use. *Held*,

    (1) That the name " grist mill " is applicable to either of said mills.

    (2) That the condition in said contract, that defendant's track shall

Hutchinson vs. The Chicago & Northwestern Railway Company.

not be " nearer than seven rods from the east line of my grist mill," must be understood of the east line of the easterly mill, and requires defendant's road to be consructed at the distance named *on the eastern side* of said line.

6. If defendant's road injures the structure of plaintiff's dam, or is built less than seven rods eastward from the east line of his mill, plaintiff is entitled to recover, for such breach of the contract, the amount of direct injury thus done to the property.

7. The court below should have construed the contract in the manner above stated, and not have admitted parol evidence to ascertain its meaning (including other contracts made by defendant for right of way over other premises in the vicinity); but the admission of such evidence is not treated as error where it appears not to have misled the jury.

8. Where it appears from the record that it must have been nearly impossible for the jury to determine, from the rulings and instructions of the court, whether damages were to be awarded against defendant for breach of its contract with plaintiff, or for taking his land under its charter, it seems that this would of itself be a sufficient ground for reversing the judgment and directing a new trial.

9. The damages to which plaintiff is entitled are the *actual depreciation in value* caused by defendant's breach of contract, as such depreciation is established by the evidence, exclusive of all remote, fanciful or speculative injuries; though, in order to account for and support their opinion of depreciated value, the witnesses may be permitted to state all causes of injury which they think go to make up the depreciation to which they testify. *Snyder v. R. R. Co.*, 25 Wis., 60, followed.

10. But such statements by witnesses of *causes* of depreciation do not go to the jury as *evidence to assess damages upon*, but only as means by which the jury can estimate the value of the evidence as to depreciated value.

11. After the court had properly instructed the jury in this case, that "the amount of plaintiff's damages is the amount that the premises are depreciated in value by reason of the construction of the railroad," in the manner alleged instead of the manner required by the contract, it further instructed them that " danger from fire by passing trains, or the liability of horses to get frightened from the same cause, [or] noise and inconvenience arising from the proximity of the premises to the railway track, are not such injuries as will authorize *separate and distinct* damages, being too remote; but if the premises are of less value in consequence of these things, such diminution in value may be assessed by the jury." *Held*, that this instruction was calculated to mislead the jury into a belief that they were *the judges of depreciation*

Hutchinson vs. The Chicago & Northwestern Railway Company.

*from the causes named,* provided their estimate of depreciation from those causes were not made a separate and distinct finding, but included in the general aggregate of damages allowed by the verdict. And, for this error in the instruction, the judgment must be reversed.

APPEAL from the Circuit Court for *Juneau* County.

The complaint alleges that the plaintiff, being then the owner of the premises therein described, and the defendant, on or about the 1st day of February, 1872, entered into a written contract of which the following is a copy:

"Know all men by these presents, that I, John Hutchinson, of the county of Juneau and state of Wisconsin, in consideration of the probable location of the Chicago and Northwestern Railway over the premises hereinafter described, and of the sum of one dollar, I hereby acknowledge to have received of the Chicago and Northwestern Railway Company, do hereby for myself and heirs, executors, administrators and assigns, covenant and agree to and with said company, to sell and convey to the Chicago and Northwestern Railway Company, its successors or assigns, by a good and sufficient deed, at any time, on demand of said company, its agents or assigns, the fee simple of a strip of land, not exceeding one hundred feet in width, over and through the following described premises, lying and being in the county of Juneau and state of Wisconsin, and particularly described as follows:  The S. W. ¼, S. W. ¼, 30 acres, section 33, T. 15 N., R. 2 east, in above county, provided said railroad track shall not interfere with or injure the structure which now sustains my mill dam, and not to run nearer than seven rods from the east line of my grist mill in said town, if said railway company shall be located thereon upon the payment or tender of the sum or sums hereinafter specified.  Also for such additional width as may be required for slopes or spoil banks of said railway; and the undersigned further agree and empower said company to fell all timber within one hundred and fifty feet from the center line of said railway as it shall be located for construction on said premises;

also, to cut any trees within any distance which, in the opinion of the engineer of said railway might endanger the track by falling, hereby giving full power to said company on the definite location of said railway to enter upon the land and premises of the width aforesaid, and occupy, use and control the same and all the rights, privileges, profits and appurtenances thereto belonging.

In witness whereof I have hereunto set my hand and seal, this 1st day of February, and in the year of our Lord, 1872. JOHN HUTCHINSON. [Seal.]"

It further alleges that said contract was duly acknowledged, and was delivered to the defendant, who caused it to be recorded in the registry of said county; that pursuant thereto the defendant company, on or about May 1st, 1872, by its agents, etc., entered upon the said lands, and commenced the construction of said road, and built the same in accordance with said contract, except that, wrongfully disregarding the contract, and against plaintiff's will, defendant built and constructed the track within about fifty feet of the grist mill referred to in said contract, and on high trestle work, and run their trains thereon in the immediate view of the entrance of said mill, thereby rendering it unsafe and dangerous for customers to drive up to the door of the mill; and that defendant built and constructed a large and lengthy trestle work directly on top of the dam mentioned in the contract, and within seven rods of said mill, and drove a large number of piles directly into the said dam and the structure thereof, greatly injuring the same, and also drove a number of piles directly into the dam, and in front of the waste gate of the plaintiff, situate in said dam, to the great injury thereof; and that afterwards, prior to commencement of suit, defendant, although expressly forbidden, constructed a water tank directly on top of said dam, digging into the structure of dam and greatly injuring the same. The complaint further alleges that by reason of the defendant's constructing their said track within the seven rods of said mill, the

property of the plaintiff, to wit, within about fifty feet, and in the manner above set forth, it will be necessary for him, and he will be obliged, to change the location of said mill building, and alter and change accordingly the flume and other appurtenances, in order that it may be safe and practicable for customers to do business therewith, and it will be necessary, and he will be obliged to go to large expense in repairing, changing and filling up said dam, and rearranging and changing the waste gate so that said gate and the different parts of the dam can be reached with teams in case of a break, or any other necessary work or repairs thereon, and a large amount of expense will have to be incurred to make safe the dam and remedy and guard against the injuries to the structure thereof; and that by reason of the failure on the part of defendant to comply with said contract, the lands of the plaintiff described therein, with the water power and mill property and appurtenances have been greatly depreciated in value; by reason whereof, plaintiff has suffered and will be put to great damage, to wit, the sum of $5,000, wholly by reason of the failure and neglect on the part of the defendant to perform their part of said contract.

The answer alleges that the railroad was constructed in full accordance with the contract, as understood by defendant; that the plaintiff, with full knowledge, etc., made no objection, but acquiesced in the manner of construction of the road over his premises, and in the defendant's interpretation of the contract; and that the tank mentioned in the complaint is only a temporary structure.

Upon the trial the plaintiff testified, in substance, that the company had built the track only 54 feet distant from his east mill; that thereby the value of his property had been lessened $5,500 more than it would have been, had the company built the road seven rods from the mill; that the feed mill, which was the eastward of his mills, and the one intended to be referred to in the contract, would have to be removed

Hutchinson vs. The Chicago & Northwestern Railway Company.

from where it is, at an expense of about $1,500; that such removal was necessary to enable customers to get to it with their grists, and in order to get it further from the railroad; as, with the track so near, he was unable to get insurance upon it, because of the hazard of the risk; that he had two mills, one a feed mill for grinding coarse grains for customers for feed; the other, a wheat mill (the situation of the mills, dam and railroad is fully explained in the engraving herewith given); that they were both grist mills; both operated for grinding grists for customers; that the company had built the road on his dam, that is, had driven piles into the dam across the same, and about ten feet north of the wall, and built the road on the piles; that the piles and the track prevented him from getting on to the dam with teams, to repair it when it broke or needed repairs; that the teams, which would have to be driven upon it to draw materials for repairs, could not turn upon the dam because of the piles, and the passing trains would frighten the horses. The dam, as described by the witness, had a stone wall laid up dry for the back of the dam, 3 to 5 feet wide at the bottom and 7½ feet high. Upon the upper or north side of the wall was filled in a quantity of earth, broken stone and gravel, some four feet higher than the water's level; and the dam was about fifteen feet wide on the top, and the slope extended upward under the water. The witness also testified that the track was laid 99 feet from his barn; that the exposure to sparks would require the barn to be moved at an expense of $150. G. Bellinger, a witness for the plaintiff, testified that he was a millwright and miller; that, in his opinion, the plaintiff's property was depreciated from $3,500 to $5,106 by the location of the railroad as it was, more than it would be by locating the track seven rods distant, basing his estimate upon the probable cost of building a new dam or enlarging the old one by widening it, so that teams could go upon it to repair it, and of removing the feed mill, and its water wheel and machinery. Newell Carpenter, a millwright, as a witness for the plaintiff, testified that

the mill property was damaged from $6,000 to $7,000, by the location of the road in the manner described, more than it would have been if the track had been laid seven rods distant; thought it would require that amount to build a new dam in proper shape, and to move the feed mill. Benjamin Bowman, for the plaintiff, estimated the damage at $3,500. Each of these witnesses testified as to the grounds of depreciation, their statements being substantially like those of the plaintiff as to the causes, and were cross examined at considerable length thereupon.

E. Pool, a witness for plaintiff, testified that he was present when the contract was made between the plaintiff and Steele, the agent of the company, and that the grist mill referred to in the contract was the east mill, or feed mill; that he owned the land south and adjoining the lands of the plaintiff, mentioned in the contract; that Steele at the same time procured a right of way from witness through his adjoining lands, and that the right of way procured of him at the same time would bring the line of the track seven rods or upwards from the feed mill across the plaintiff's land. A. W. Pulford, for the plaintiff, testified that at the same time plaintiff's contract was made, Steele obtained from him a contract for right of way across lands which he owned, north of the plaintiff's land; that the right of way was conveyed on Humbird's survey, or not to run less than eight rods east of the west line of his lots. The survey known as the Humbird survey was proved to be from seven to eight rods from the feed mill. The plaintiff also offered evidence tending to prove that the building of the road, where it was built, had injured a stone quarry on his land, which would not have been injured had the road been located as provided in the contract; that his mill pond had been injured by the location of the track, which had caused a deposit of sand in front of the flume; and that his mill had once caught fire, as it was supposed, from sparks from the passing locomotives.

Evidence was given on the part of the defendant, tending to show that the construction of the track had not injured the structure of the dam, but rather strengthened it; that it could with an expense of $25, in building a road over the waste way for empty teams to pass off from the dam, be arranged so that teams could go upon it to make repairs; that with little expense the feed mill could be rendered safe of approach by the erection of a high fence between it and the track, etc. Steele, the agent of the company, who obtained the contract, testified that, in making it, he had reference to the westward or flouring mill. Several witnesses for defendant testified to the definition of a "grist mill" as not embracing the feed mill. The plaintiff's witnesses testified that the east mill was what is properly termed a "grist mill."

The foregoing is a brief statement of the evidence given on the trial, so far as it appears to be material to the opinion.

The court charged the jury as follows : "The plaintiff sues to recover damages claimed to be sustained by reason of the construction of defendant's railway across his premises. The case shows that the plaintiff contracted with the defendant the right of way across his lands, limiting the right so that the dam should not be interfered with to its injury, and also that the road should not be built within seven rods of his 'grist mill,' or nearer than seven rods of the east line of his grist mill; that plaintiff has two mills in that locality, both of which are used in grinding grain, one exclusively for grinding grain for feed, or that does not require bolting, and the other used in making flour for human food ; that one of these mills, the feed mill, is within at least sixty feet of the railway track as constructed, and that the other mill is at least seven rods from said railway track. The plaintiff claims that the feed mill, so called, is a grist mill, and is *the* grist mill alluded to in the said contract, and therefore, that the defendant has not built its railroad within the terms of the contract, but within a much less distance than seven rods of his grist mill, greatly

to his damage, beyond what it would have been if the road had been built seven rods away. This statement presents to our view the first question that naturally arises in this case, for if the defendant has constructed its line of road within the license given by the plaintiff, it is the end of this case; but to determine that question, and in aid of the contract, it becomes necessary to ascertain the meaning of the term grist mill, or rather whether that term implies a mill of the kind and character of the so called feed mill; if it does, then the track is less than seven rods from a grist mill. This question depends upon the usual general and ordinary definition and meaning given to those terms, how the same are ordinarily understood, that would govern in the absence of proof that the parties attached any special or particular meaning to them. If the jury shall find that the term grist mill does not imply such a mill as the evidence shows the so called feed mill to be, then the plaintiff cannot recover, it being admitted that the track is at least seven rods from the other mill, unless the defendant has violated the said contract in regard to the dam. But if the said feed mill does fall within the general and ordinary meaning of the words grist mill, it will be necessary to reduce the ambiguity appearing on the contract, that is, ascertain to which of those two grist mills the parties intended the contract should apply. The statement of the parties at the time the contract was made, and any other circumstances in evidence bearing on the question, are proper for your consideration ;in determining that question. The Humbird survey has no bearing on the question, except so far as it may explain and show what the real understanding of the parties was.

"If this question is determined in favor of the plaintiff, you will then proceed to ascertain what damage, if any, he has sustained by reason of the construction of the railroad over and beyond what his damages would have been, if any, had the road been constructed as contemplated in and by said contract. The measure of the plaintiff's damages is the amount that the

premises have been or are depreciated in value by reason of the construction of the railroad as before stated, or in other words, how much less is the property of the plaintiff worth situated and circumstanced as the same was and is, than it would have been worth had the railroad been constructed as contemplated in the contract. That is the whole sum and substance of it, notwithstanding a great number of circumstances may enter into and constitute elements going to make up the amount. That is the general rule, as I understand it, as applied to a case of this kind, and is the correct rule because it can be made uniform in its application. The cost of removing the plaintiff's buildings to a more safe place is not the correct mode of ascertaining the damage as a rule, because there might be cases where the expense of removal might be as great as the value of the structure, notwithstanding it was of some value before removal, though depreciated by the proximity of the railroad. The fact that the feed mill is less safe from fire, is no reason why it should be moved to a new place and fitted up in a new place at defendant's expense, but if its proximity to the railroad increases the danger by fire from passing trains, and the difficulty in going to and from the mill by reason of the liability of horses to be frightened by the noise of the cars, is increased, diminishes the value of the property, the amount in which it is thus diminished is an actual damage that the defendant must pay; if it is rendered worthless by reason of such things, then the defendant should pay the entire value. These remarks apply to the barn as well as to the feed mill. The amount that it is lessened in value by reason of the building of the railroad beyond what it would have been, if it had been built as contemplated in the contract, the sum of the damage to the barn is the amount of such diminution as you shall find the same to be. You may give the entire value of the barn, if you find that it is rendered valueless by reasons above stated, but you cannot assess the damage by the cost of removal. In regard to the dam, if the defend-

ant has so interfered with it as to increase the cost of repairs and render access thereto difficult and inconvenient by reason of piling driven into it by the defendant, or by reason of the liability of horses used in repairing it being frightened by passing trains, if these things diminish its value as a mill dam and increase the expense of keeping up and maintaining the same, it constitutes damages within the meaning of the law, but you cannot allow the plaintiff the cost of a new dam, unless he is deprived of the use of the present one, and then only to the extent of the cost of such a dam as this. Danger from fire by passing trains, or the liability of horses to get frightened from the same cause, noise and inconvenience arising from the proximity of the premises to the railway track are not such injuries as will authorize separate and distinct damages, being in their relation too remote, but if the premises are of less value in consequence of those things, such diminution in value may be assessed by the jury."

The defendant's counsel then asked, and the court gave the following instructions: "1. The contract set forth in the complaint, and proved on the trial, is an *ex parte* contract executed by the plaintiff alone, and contains no covenant or agreement that the defendant would build a railroad or any specified line across the plaintiff's premises; hence the defendant is not liable to the plaintiff in damages for a violation of that contract, although it built the track of its railroad within seven rods of the grist mill of the plaintiff. 2. The contract set forth in the complaint, and read in evidence by the plaintiff, is in legal effect an offer on the part of the plaintiff to give a right of way across the premises therein described to the defendant, if it would build a railroad across said premises seven rods from the plaintiff's grist mill, but, as the contract contains no agreement on the part of the defendant to build its road that distance from the plaintiff's grist mill, the plaintiff is not entitled to recover damages for the violation of the contract on the part of the defend-

ant, although the jury should find that the road is built less than seven rods from the plaintiff's grist mill."

The court refused to charge as asked by defendant's counsel: "that the ordinary and common meaning of the term grist mill, is a mill which contains machinery for bolting flour made from wheat or other grain, and does not properly apply to a mill used for grinding, without bolting, coarse grain, as feed for stock; that if the jury find from the evidence that the said road was constructed seven rods from the flouring mill of the plaintiff, the proviso in the contract is complied with, and the plaintiff is not entitled to recover, if the jury find the road was properly constructed, doing the plaintiff no unnecessary damage in its construction; that the plaintiff is not entitled to recover the cost of moving his barn to the place mentioned by the witnesses, or to any other place; that the contingency or possibility that the plaintiff's barn may take fire, is too remote to base a claim for damages upon, and the plaintiff is not entitled to recover any damages for the contingency or possibility, or even the probability, if the jury shall find such probability to exist, of the said barn taking fire. Although the jury may believe from the evidence that there is a possibility or even a probability that the plaintiff's feed mill may take fire from some passing engine on the defendant's road, yet such possibility or probability is too remote to base a claim for damages upon, and the plaintiff is not entitled to recover for any danger of said mills taking fire, which the jury may believe exists."

The court gave the following instruction as modified by the general charge: "Although the jury may believe from the evidence that horses driven to plaintiff's feed mill are liable to be frightened by trains of cars passing on the defendant's railroad, yet any damage which the plaintiff may sustain from loss of custom to his said mill on account of the liability of horses driven to said mill being so frightened, is too remote and contingent, and the plaintiff is not entitled to recover damage therefor in this action. Although the jury may believe from

the evidence that in case a break should occur in the plaintiff's dam, horses which might be used in repairing such break, or generally in repairing plaintiff's dam, although no break should occur therein, might be frightened by trains of cars passing on the defendant's railroad, the plaintiff is not entitled to recover any damages by reason of the liability of horses to be frightened under the circumstances stated, because such damages are too remote and contingent. The plaintiff is not entitled to recover for any damage which the jury may believe the plaintiff has sustained or may hereafter sustain by reason of the liability of any horses which may be driven upon or used upon the plaintiff's premises, becoming frightened by trains of cars passing on the defendant's road, for the reason that such damage is too remote and contingent. The plaintiff is not entitled to recover damages on account of sand and dirt being carried or washed into the mill pond on the north side opposite to the flume, for the reason that at that point said railroad is more than seven rods from the plaintiff's mills, and no amount of damage has been proved. The plaintiff is not entitled to recover for any damages to his stone quarry, for the reason that the same is situated more than seven rods from plaintiff's mill. The plaintiff is not entitled to recover the cost of moving his feed mill, although the jury should find that it is necessary to move the same to escape danger from fire and danger of horses being frightened by passing trains of cars, or from either of said causes."

The court refused to instruct the jury as requested by defendant's counsel : " That, the fact that other contracts were taken by or given to the defendant at or about the same time of plaintiff's contract with different or other conditions or limitations made in them, has no bearing upon the case. And the agreement of the plaintiff, having been reduced to writing, must govern in this case, and the language of the contract must be construed as having its usual, ordinary meaning and effect."

The court gave the instruction, as requested : " That the condition in the contract, that says, ' provided said railroad track shall not interfere with or injure the structure which now sustains my mill dam,' amounts to a reservation to the plaintiff of the right or privilege to go on the dam to repair it, and therefore estimates made by the witnesses based upon the idea or statement that plaintiff would have no right to go on there to repair, or that the railroad company do have or were to have an absolute control or right to the dam and the whole of it absolutely, and that they could prevent plaintiff entering upon it to repair or strengthen the dam or its structure, are not proper to be considered as bearing upon the question of damages in this case, as under the proper construction of the conditions of this contract, the plaintiff intended and must be held to have reserved at least the right of entry upon any of the lands included in the contract for purposes connected with the dam and its maintenance in a proper condition."

Upon the request of the defendant, a special verdict was submitted to the jury, upon which they found that the plaintiff's mill dam had been weakened or injured by the construction of the railroad ; that thereby the plaintiff had sustained damage to the amount of $3,475 ; that the construction of the railroad lessened the facilities for repairing the plaintiff's dam, whereby he had sustained damage to the amount of $25 ; that the plaintiff had sustained damage on account of the liabilities of horses going to his feed mill, being frightened by the engines and cars passing on the railroad and danger of fire from the same, to the amount of $1,500 ; that the plaintiff had sustained damage by reason of damage to his barn taking fire from the engine, $100. The court directed the jury to find specially upon the following facts, at plaintiff's request: " 1. Has the defendant by the construction of the railroad track interfered with or injured the dam of the plaintiff ? " The jury found in the affirmative. " 2. Has the defendant constructed the railroad track so that it runs nearer than seven

rods to the east line of plaintiff's grist mill mentioned in the contract?" The jury answered yes. "3. If the jury find either of the above facts in the affirmative, does it depreciate the value of the lands and appurtenances of the plaintiff described in the contract, and if so, how much?" To this the jury returned the sum of $5,100, which sum they found for the plaintiff. Motion for new trial was overruled, and judgment was entered on the verdict, from which the defendant appealed.

*Sloan, Stevens & Morris*, for appellant, argued: 1. The action was based wholly on the contract. Damages are claimed and can be, only for the breach; and the action cannot be treated as one of trespass. *Babb v. Mackey*, 10 Wis., 377; *Eilert v. Oshkosh*, 14 id., 586; *Newton v. Allis*, 12 id., 421; *Larkin v. Noonan*, 19 id., 82; *Stevens v. Brooks*, 23 id., 196. 2. The contract was *ex parte*, not binding on the defendant company, but was only an offer on the part of the plaintiff. *Belmont v. Coman* 22 N. Y., 438, 439; *Trotter v. Hughes*, 12 id., 74; *Thorp v. Keokuk Coal Co.*, 48 id., 253; *Bishop v. Douglas*, 25 Wis., 696. The charge was inconsistent, but gave the instruction that the plaintiff was not entitled to recover on the contract, and yet the other rulings are given and the case proceeds and is treated after verdict as though no such instruction had been given. 3. The provision of the contract that "it shall not interfere with or injure the structure which now sustains my mill dam," evidently refers to the stone wall at the back of the dam; and there is no proof to show, and no claim that the wall has been injured. So that the only question to be considered is whether that part of the proviso, that the railroad shall "*not run nearer than seven rods from the east line of my grist mill*," has been violated. The answer to this question depends upon the meaning and application to the plaintiff's mills of the term "grist mill." As shown by the testimony, fairly considered, the west mill was the "grist mill," the east mill a feed mill. The contract presented no latent ambiguity to be solved.

The court should not have admitted evidence, but should have instructed the jury that the term applied only to the mill used for making bolted flour. The verdict of the jury that the term applied to the feed mill, was not supported by the evidence, upon which counsel commented. The language of a contract is to be most strongly construed against the person using it. Applying this rule to the contract in suit, keeping in view that one mill was usually called a grist mill and the east one a feed mill, and there can be no doubt that the proviso of the contract was not violated in the location of the track. The other proviso of the contract throws light on this question. The track could be built seven rods from the flouring mill and not injure the structure of the dam; if built nearer, it would interfere with the wall which supported the dam. If the feed mill had been intended in the distance clause, it would have carried the track more than 40 feet north of any part of the dam, and it would have been nonsense to put in the proviso in regard to the injury of the dam, as in that case the track could by no possibility touch the dam. 4. The motion to dismiss the complaint, as not stating facts sufficient to constitute a cause of action should have been granted, for the reason that the proceedings provided by sec. 2, ch. 175, Laws of 1861, for ascertaining compensation, is exclusive of all remedies at common law, by action or bill in equity. 1 Redf. on Railw., 296; *Ford v. C. & N. W. R'y. Co.*, 14 Wis., 609; *Pettibone v. L. C. & M. R. R. Co.*, id., 443; *Loop v. Chamberlain*, 17 id., 504; *Andrews v. F. L. & T. Co.*, 22 id., 288. 5. The court erred in admitting evidence of damages. The proper question is, What is the difference between the *market value* before and after construction of the road? The questions permitted to be answered left the witnesses at liberty to base their estimates in value on notional and speculative grounds, as they evidently did, and the evidence given would have been inadmissible under any form of question, or in any proceeding. Testimony that the " feed mill " would have to be removed from where it is, was

improper; as was the testimony in regard to a new dam and the removal of the barn. *Watson v. P. & C. R'y. Co.*, 37 Pa. St., 319. The contingencies upon which the building of a new dam depend are remote and absurd. They are: 1. If a break should happen to occur in the dam ; and, 2. If the plaintiff should happen to discover such break before much of the dam washed away ; and, 3. If the plaintiff should happen to employ horses in repairing such break, that were afraid of the cars ; and, 4. If a train of cars should happen to pass at such critical time; and, 5. If such train should happen to frighten the horses so that the driver could not control them, so that from that cause the work of repairing would have to be abandoned ; 6. Then upon the happening of all the above contingencies, serious injury might occur to the dam, and great damage be sustained by plaintiff. No injury has in fact happened or resulted to the dam, and none is claimed to have happened, from these contingencies. The only injury proven was, that in driving across it, an expense which the jury have fixed at $25, would have to be incurred in making a road on the south side of the waste weir, and the digging of a trench in the dam, which plaintiff testifies could be done by a man with a wheel barrow in half a day. 6. The only damage claimed to have been done to the mills, is caused by the danger of the feed mill taking fire from passing engines, and the liability of horses driven to it, to be frightened by passing trains. These are remote, imaginary and speculative. · *Robbins v. M. & H. R'y Co.*, 6 Wis., 636 ; *Snyder v. W. U. R'y Co.*, 25 id., 60 ; *Price v. M. & St. P. R'y Co.*, 27 id., 98 ; *Sunbury & E. R'y Co. v. Hummell*, 27 Pa. St., 99 ; *Troy & B. R'y Co. v. H. T. Co.*, 16 Barb., 103 ; *C. & N. F. R'y Co. v. Payne*, id., 273 ; *A. N. R'y Co. v. Lansing*, id., 68 ; *N. V. & J. R'y Co. v. Young*, 53 id., 457 ; *Presbrey v. O. C. & N. R'y Co.*, 103 Mass., 1 ; *Wilmington, etc., R'y Co. v. Stauffer*, 60 Pa. St., 374, 378. 7. The judgment should be reversed for the inconsistency of the charge. "The rule sanctioned and acted on by this court is, where erroneous instructions are

given for one party, the error is not corrected·by giving for the other party, instructions explanatory of, inconsistent with, or contradictory to those first given." *McCabe v. Town of Hammond*, 34 Wis., 590; *Imhoff v. C. & M. R'y Co.*, 20 id., 344; *Hopkins v. Langton*, 30 id., 379. Counsel commented on the instructions given and those refused, arguing that the giving and refusing were error, for the reasons fully set forth in the opinion.

*J. W. Lusk*, for respondent, to the point that the evidence admitted to show which mill the parties intended to refer to in the contract was proper, cited, 1 Greenl. Ev., § 288; *McDonald v. Longbottom*, 1 Ellis & Ellis, 977; *Ganson v. Madigan*, 15 Wis., 144; *Merriam v. Field*, 29 id., 598; *Walworth v. Thompson*, 4 Hill, 200; *Blair v. Corby*, 37 Mo., 313; *Sewell v. Shumway*, 102 Mass,, 365. In answer to the point, that the contract was *ex parte*, he cited *Bishop v. Douglas*, 25 Wis., 196; *Vilas v. Dickenson*, 13 id., 488; *McClellan v. Sanford*, 26 id., 595; *Paschall v. Passmore*, 15 Pa. St., 295, 307. To the point, that the testimony of the witness Bellinger as to the damage to plaintiff's property was admissible, he cited *Snyder v. W. U. R. R. Co.*, 25 Wis., 60; *Robbins v. M. & H. R. R. Co.*, 6 id., 636; *Parks v. W. C. R. R. Co.*, 33 id., 413.

RYAN, C. J. The counsel on both sides agree that this is an action on the instrument set forth in the complaint, and we agree with them. How that accords with some of the positions of the parties in the court below and in this court, we need not stop to inquire.

The court below, on the prayer of the appellant, charged the jury that the *contract* is an *ex parte* contract; in legal effect an offer of the respondent to give the right of way on the terms stated, not binding the appellant or making it liable for violation of its terms. If that be so, it is difficult to understand on what ground the court below sustained the action or upheld the verdict for the respondent.

Contract, *ex vi termini*, implies concurrence of parties; and

the term does not seem to have been very accurately used. An offer, unaccepted, is not a contract, because it is *ex parte.* When accepted, it ceases to be an offer and becomes a contract. If the offer be in writing signed only by the party making it, and is merely accepted, not signed, by the other party, it becomes what civilians call a unilateral contract, binding both parties. And we are able to gather that, by the somewhat novel term "*ex parte* contract," the court below intended a deed poll, anciently called *charta de una parte.* And we understand the instructions in question to rest on the doctrine, not yet wholly abandoned even in this country, that when a grantee does not execute the deed he accepts, he may be bound by the terms of an indenture, but not by those of a deed poll. *Giles v. Pratt,* 2 Hill (S. C.), 439.

Very strict lawyers cling to a doubt whether a party ought to be bound by the terms of a deed which he does not execute, even by indenture. Platt Cov., 10–18. But Mr. Platt's learning compels him to admit that the doctrine is well established in England, that acceptance of an indenture binds the grantee without execution. The doctrine is also accepted in this country. See the well considered case of *Finley v. Simpson,* 2 Zabr., 311. And the question is not an open one in this court. *Vilas v. Dickenson,* 13 Wis., 488; *Bishop v. Douglass,* 25 id., 696; *McClellan v. Sanford,* 26 id., 595; *Lowber v. Connit,* 36 id., 176.

A deed poll may run in the third person as well as in the first (Shep. Touch., 51); and an indenture in the first as well as in the third. Co. Litt., 229 b, 230 a. The only real difference in form is, that an indenture purports to be the deed of both or all parties to it, and a deed poll the deed of the grantor only. So of old an indenture was written in counterparts, one for each party, all correspondingly indented, for the purpose of identification; and a deed poll, in one part only, cut evenly or polled, without indenture. Shep. Touch., 50. And the mechanical process was essential to an indenture; for "it may be

an indenture without words, but not by words without indenting." Co. Litt., 229 a.

And it was held that an indenture was the deed of the grantee, though not executed by him, because he accepted it importing to be sealed by him; but that acceptance of a deed poll did not bind him, because it did not import to be sealed by him. Co. Litt., 229 a, 230 b.

There were once meaning and purpose in these distinctions, puerile as some of them now seem; but the names have long survived all useful sense. In our conveyancing, these subtleties are practically obsolete. Our common deed of conveyance is never indented or executed in parts; and is not an indenture, though it so calls itself and imports execution by both parties. It is universally executed and dealt with as a deed poll. And sometimes a deed poll is substituted for it, without question of difference in law, as there is none in fact. And this court has given the same effect, as ought in reason to be given, to acceptance of deeds poll as to acceptance of indentures, without pausing to weigh subtleties of distinction which died long ago out of the practical business of American life. See cases cited *supra*.

In the case before us, the appellant accepted the instrument and registered it; entered under it, and claims to have complied with its terms. This is, in effect, the appellant's answer. It would be strange if it could accept the grant, freed from the provisions qualifying the grant; take the estate, without the limitations of the estate; claim under the contract, without being bound by its terms. The appellant took its right *cum onere;* and, by accepting the instrument, bound itself as much by the terms of the contract, as if it had sealed it. We say as much bound, without referring to the form of obligation or to the distinction recognized in *Bishop v. Douglas.*

What would have been the relations of the parties, had the appellant avoided the respondent's premises, or undertaken to secure the right of way over them under its charter, we need

not consider. It 'did neither, but entered and constructed its road under the contract.

By the terms of the contract, the appellant took the right of way, bound to the respondent that its railroad track should not interfere with or injure the structure which sustains his mill dam, and should not run nearer than seven rods from the east line of his grist mill. Questions are made on the construction of these agreements, which are not free from difficulty.

The respondent's dam does not appear to be sustained by any other structure. There is a wall which is evidently a part of the dam, and cannot properly be regarded as a structure which sustains it. Presumably it sustains the earth-work, and the earth-work sustains it: both mutual parts of one whole. The terms of the contract would apply equally to each, and properly to neither. All surroundings show that the wall is not the structure intended.

The term "mill-dam" implies an artificial structure. *Jackson v. Lawrence*, 11 Johns., 191. One structure may sustain another: as a pedestal, a pillar; and the pillar, a portico; and the portico, a pediment: all perhaps, in legal sense, parts of one structure, merged in the building to which they appertain. But it is difficult to comprehend how any separate structure can sustain a mill-dam, which appears to imply a necessity of resting on the bed of the stream dammed, self-sustaining, and incapable of receiving support from any structure not essentially a part of its own structure. Structures in a dam may give it strength; structures added to a dam may increase its strength; but all such seem of necessity to be component parts of the structure of the dam itself. Here, certainly, there does not appear to be any other.

A house may be built on an independent trestle or other separate underpinning; or on a bridge, as happened in Janesville; or on a scow afloat, as suggested by Cooper. Then, if a writing should mention the structure which sustains the house, the meaning would be apparent. But if a house be built with

stone walls whose foundations rest directly in the solid earth, and an instrument speak of the structure which sustains the house, what should be understood ? There is no structure but the house itself. Several structures in detail may have gone to its construction, serving to support each other and the whole; but all are merged in the one structure of the house. And it appears to us that the house itself would be the structure intended : the only construction which the words would admit, and one which they would admit, because such a structure sustains itself, and is sustained by no other. And so of this mill-dam. The dam may be composed of several works in detail which go to sustain each other, and together to sustain the whole; but they are all parts of the dam, tending to make it a self-sustaining structure, and all parts of the structure which sustains the dam : the word structure being used in the sense of construction. And so the dam itself is the structure which sustains the dam.

Another view of the phrase, not without great weight, leads to the same conclusion. Back-water is the object of a mill-dam : the dam mere means to that end. So, by a familiar metonymy, the cause and the effect, the means and the end, are indifferently used to signify each other. Thus, in common speech, a reservoir often signifies the water kept, not the structure in which it is kept; and a dam signifies the pond, and not the obstruction by which the pond is held. So we sometimes hear of fishing or bathing in a dam ; and often of the water in a dam, meaning in the pond. So a pond is made to include the dam, even in judicial phrase. *Jackson v. Vermilyea*, 6 Cow., 677. And grant of a dam is held to include an easement in the pond. *Maddox v. Goddard*, 3 Shepley, 218; *Sabine v. Johnson*, 35 Wis., 185. And a finding of the height of water in a pond is equivalent to finding the height of the dam. *Aken v. Parfrey*, 35 Wis., 249. Our statute on the subject, from 1840 to this day, has always been entitled " Of Mills and Mill Dams " only, though its chief relation — it might almost

be said its sole relation — is to mill ponds, and not to mill dams. And so it may well have been that the structure which sustains the mill dam, here, was intended to signify the structure of the dam which supports the mill pond. There is apparently nothing else for it to mean, and it can mean that. The dam, of itself, is probably of little or no value. The value is in the pond. The respondent was caring for the integrity of his property ; and, by a not rare misuse of words, confused the means and the end. And this seems to be a fair, rational and probable construction of the respondent's intention in the use of the phrase, perfectly according with our construction of the phrase itself as it stands in the contract, otherwise unintelligible.

It is always the duty of all courts to give construction to all contracts, if it can be done, *ut res valeat.* We are to avoid ambiguities, when we are able, by finding and giving effect to the intent and meaning of parties in the language of their contracts. And we have arrived at this construction of the language of this contract, not without difficulty, in order that the contract may have effect without doubtful and dangerous recourse to parol explanations, as in *Ganson v. Madigan,* 13 Wis., 67.

So we hold that the appellant's acceptance of the contract bound it, in legal effect, by a provision that its railroad track should not interfere with or injure the structure of the respondent's dam.

The other question of construction is of much less difficulty. There are on the respondent's premises two mills, lying easterly and westerly within a few feet of each other. The westerly is constructed and used, with bolting apparatus, to grind wheat; the easterly, without bolting apparatus, to grind coarse grain : both for customers bringing their own grain to be ground for their own use. And it is contended that the mill for coarse grain is not a grist-mill; that the contract has relation to the wheat mill only.

We understand the popular sense of the term "grist-mill"

to be, a mill which grinds grain taken to it to be ground for the owners for toll; grain so taken being popularly called a grist. We do not understand either term to be popularly restricted to any kind of grain. And these popular meanings accord with the definitions in Webster's and Worcester's dictionaries; with the definitions in the English dictionaries of the word "grist," and with the definition of the term "grist-mill," in the Imperial, the only English dictionary in which we find it. And they are confirmed by the etymology of the word "grist," which all the authorities appear to refer to grain taken to be ground, and not to the process or production of grinding. Wedgewood, Johnson, Webster, etc. In critical and popular sense alike, we take any mill which grinds any kind of grain which people take there to be ground for themselves, to be a grist-mill.

We therefore consider both of the respondent's mills to be grist-mills. And the question arises, whether, the fact appearing that there are two mills, it can be determined by the contract itself to which of the two it relates. We think it can.

There is no positive intendment in the contract that there is only one grist-mill of the respondent; but only that there is one. Yet it gives an impression that there is but one. And, on the assumption that there is but one, when the contract provides that the track shall run not nearer than seven rods from the eastern line of it, there is a fair intendment that the track shall run eastward of it. The purpose is to fix a safe distance of the track from the mill; and it would be an unreasonable construction of the contract, that the track might run nearer on the west than on the east of it. When a measure for one object is taken from one side of another, it naturally — almost necessarily — implies the position of the first object to be on that side of the second. Men do not measure from the east line of a building or lot or highway, to fix the location of an object on the west side of it. Had it been the intention of the contract that the track might run on any side

of the mill, it would have said seven rods from the mill, not seven rods from the east line of it. And if there were but one mill, we should be inclined to hold that the contract requires the track to run eastward of it.

And when the *locus in quo* shows two grist mills, it appears to us not only to disclose a latent ambiguity, but also to solve it. For, if the contract be to run seven rods eastward of one mill, and there are two within its terms, it is in effect a contract to run seven rods to the eastward of the eastward mill. If the track should run beyond seven rods from one and within seven rods of the other, it would be in violation of the letter and spirit of the prohibition. And it would be a wildly unreasonable construction, that the track might run west of the westerly mill as near as seven rods to the east line of the easterly mill, when it could not run east of the easterly mill nearer than seven rods. Before it appears that there are two grist mills, and *a fortiori* after, it is the fair intendment of the contract that the track should run at least seven rods east of the east line of the nearest mill. It would be trifling with the interest and object of the restriction, a mere play upon the words of the contract against its sense, to hold otherwise.

Perhaps this view of the contract on its face may be somewhat confirmed by the shape of the two mills as seen on the plat in the record. The easterly mill appears to be one rectangular parallelogram, with an unbroken easterly line. The westerly mill is of the shape of two joined together, with two easterly lines. And it might be further confirmed by the fact in evidence, that the line surveyed and proposed, before the contract, was eastward of both mills. But the terms of the contract as written, applied to the premises as they are, need no aid from extrinsic facts.

And we hold that the appellant's acceptance of the contract bound it to run its railroad track not nearer than seven rods from the east line of the respondent's easterly mill.

Subject to these two provisions, the contract vests the appel-

lant with full right to locate and construct its track over the respondent's premises, without other limitation or condition.

The respondent pleaded for breaches, in effect, that the railroad track built by the appellant under the contract interferes with and injures the structure of the dam, and is nearer than seven rods to the east line of the easterly grist mill, by which the value of the dam and mill is lessened.

The issue was a simple one, and the rule of damages simple: the amount of direct injury to the respondent's property by the appellant's breach of the contract.

On the trial, a great mass of parol evidence was admitted to explain the contract, much of it inadmissible in any case, and all of it irrelevant in this; sometimes hard to be distinguished from evidence to other points, and tending, with other things, to confuse the trial and the record. But as all of it, perhaps, looked to the true construction of the contract upon its face, the principal error in this respect seems to have been in leaving to the jury what the court should have ruled for them. So far as the contract is concerned, it does not appear to have misled the jury; and perhaps most of it was merely irrelevant and harmless. We have more doubt about the admission of contracts of the appellant for right of way over other premises in the vicinity, offered for the purpose of explaining the respondent's contract. They were probably inadmissible for any purpose. What they were, or how they might have tended to influence the jury, does not appear. The court below refused to instruct the jury that they had no bearing on the case, and that the respondent's contract must be construed as written; and gave no instructions restricting their effect as evidence. This would make us cautious in upholding the verdict. But, except upon the point of explaining the respondent's contract, it may be that they are not within the rule of exception. *Bonner v. Home Ins. Co.*, 13 Wis., 677; *Chapman v. R. R. Co.*, 26 id., 295; *Mead v. Hein*, 28 id., 533.

We confess that we are unable to understand on what view

of it the court below sustained the action. In the admission and exclusion of evidence, the rule seems sometimes to go upon the contract, and sometimes upon damages for taking the right of way under the appellant's charter. We have the same difficulty in understanding the theory of the case on which the charge to the jury was intended to rest. The charge expressly instructed the jury that the appellant is not bound by the contract and not liable for violation of it. And yet it sets out by stating the contract and its provisions, and generally follows its terms and the alleged violations of them; and at the same time sustains grounds of damages not appearing to arise under the contract, and seeming to arise from the taking, outside of the contract. There appears to us to be much inconsistency in the charge. As DIXON, C. J., says in *Hopkins v. Langton*, "the marvel is that the jury should have known anything about the law; the strong probability is they did not," as the court below intended that they should. We cannot say that we do. It appears to us that some peculiarities of the case, leading into a great deal of irrelevant testimony, presented *de novo* in the hurry of a trial, involved the case in confusion, and that the views taken of it by the learned judge of the court below not unnaturally vacillated somewhat on the nature and scope of the action. Under such circumstances, it was nearly impossible for the jury to give a safe verdict. And we are inclined to think that this of itself would be sufficient ground to reverse the judgment. *Ward v. Henry*, 19 Wis., 76; *Sears v. Loy*, id., 96; *Imhoff v. R. R. Co.*, 20 id., 344; *Hopkins v. Langton*, 30 id., 379; *McCabe v. Hammond*, 34 id., 590.

But we prefer to rest our judgment on the rule of damages given to the jury. On that subject, the charge sets out by stating, in effect, that the respondent's damages are the amount of depreciation in value of the property by reason of the appellant's breach of contract. Had the charge rested there, it would have been unexceptionable. *Snyder v. R. R. Co.*, 25

Wis., 60. But from thence the charge seems to us to wander inadvertently from the rule and misapply it. The rule in *Snyder v. R. R. Co.* is, that the measure of damages is the actual depreciation in value as established in evidence, exclusive of all remote, fanciful or speculative injuries ; but that, in order to account for and support their opinion of depreciated value, the witnesses who prove it may be permitted to state all causes of injury which they believe go to make up the depreciation to which they testify. But these do not go as evidence to the jury to assess damages upon, but only as means by which the jury can estimate the value of the evidence of depreciated value. This is not distinction without difference ; it is a practical and important one. The witnesses who are permitted to state the grounds of their judgment, are subject to cross examination, and their judgment to criticism ; there is some safety in permitting them to speculate on the causes of depreciation. But to admit evidence of remote and conjectural sources of injury for the jury to consider and assess damages upon, without restraint or scrutiny, would be going outside of all safe rule, and plunging into the abyss of wild and supposititious damages. We think that *Snyder's Case* went fully as far as it is safe to go : farther, perhaps, than they go elsewhere (*Presbury v. R. R. Co.*, 103 Mass., 1 ; *S. & E. R. R. Co. v. Hummell*, 27 Pa. St., 99); and we are not disposed to go beyond it. Witnesses may testify to depreciation and be permitted to state the grounds of their opinion, as in *Snyder's Case ;* but evidence of remote and conjectural causes of depreciation should not be submitted to the jury as a basis for their assessment of damages. This was expressly done in the charge of the court below in the present case. And we think that the jury may well have understood that they were at liberty to assess damages for such causes, over and above their own estimate of actual depreciation. The passage in the charge relating to the mill rests, perhaps, on their estimate of actual depreciation. So, perhaps, does the passage relating to the barn, though it does not appear that the

Hutchinson vs. The Chicago & Northwestern Railway Company.

barn is affected by breach of the contract or is proper subject for damages. So, perhaps, does the passage relating to the dam, though including very conjectural sources of damage. But the concluding passage of the general charge, that danger of fire, or liability of horses to be frightened, or inconvenience arising from proximity of the track, are not such injuries as will authorize separate and distinct damages, being too remote, was, we cannot but think, well calculated to mislead the jury, even beyond the rule of the court below that the jury were the judges of depreciation from such causes. An ordinary juror would be very apt to infer that, though he could not assess separate and distinct amounts of damages for each of such causes, he might allow for them all in the aggregate damages assessed. And we cannot think that the mischief was certainly cured by the closing remark, that if these things depreciate the value of the property, the depreciated value may be assessed. The failure of the court below to give any positive and unqualified instruction that such consequential and contingent sources of injury are in themselves too remote for damages, leaves us in some doubt, as we think the jury must have been, what is the precise doctrine of the charge upon this subject. In any view of it, the charge plainly went beyond the rule in *Snyder v. R. R. Co.* And we may add that the verdict gives assurance that the jury were misled as to the proper rule of damages.

On the whole case, we are quite clear that justice requires that there should be another trial of this cause.

*By the Court.* — The judgment of the court below is reversed, and the cause remanded for a new trial.