Amos D. Ellsworth *vs.* Southern Minnesota Railway Extension Company.

March 24, 1884.

**Executory Unilateral Contract not Binding—Right to Withdraw or Rescind Same.**—To constitute an executory contract, (no money having been paid or property transferred,) there must be a mutuality of promises,—a promise for a promise, the one being the consideration of the other. Where an instrument unilateral in form as well as fact is executed by only one party, a promise or undertaking on the part of the other party to perform its conditions will not be presumed as *an inference of law* from the mere fact that the latter received and took the instrument into his possession. A promise by one party, where there is no correlative undertaking or promise by the other party, does not constitute a contract, but is a mere offer which may be withdrawn at any time before it is accepted or acted upon. The "permit," in this case, construed and *held* to be, *on its face,* a mere offer or license, which imposed no obligation on the part of the plaintiff to perform its conditions, and never having been acted upon, or accepted by him, by promising to perform, there was no contract, there being no mutuality of promises. Hence defendant had the authority to rescind or recall the "permit."

Action to enforce specific performance of an alleged agreement by defendant to convey certain land situated in Martin county, brought in the district court for that county. The agreement sought to be enforced is contained in the following circular and "permit," (referred to in the opinion as "Exhibit A,") viz.:

CIRCULAR RELATING TO THE LANDS OF THE SOUTHERN MINNESOTA RAILWAY EXTENSION COMPANY.

By an act of congress approved July 4, 1866, entitled " An act making an additional grant of lands to the state of Minnesota, in alternate sections, to aid in the construction of railroads in said state," certain lands were granted to the state of Minnesota for the purpose of aiding in the construction of a railroad from Houston county (at that time the western terminus of the Southern Minnesota Railroad) to the west line of the state. By an act of the legislature approved February 25, 1867, the state accepted the trust created by this act of congress, and granted the lands to the Southern Minnesota Railroad Company. The Southern Minnesota Railroad Company having failed to complete its road within the time prescribed by the acts of congress and of the state legislature, such of the lands as had not been acquired by that company before the completion of a portion of its line, were, by an act of the legislature of Minnesota approved March 6, 1878, transferred and granted to the Southern Minnesota Railway Extension Company, on the condition of the completion of the line of road of that company to Fairmont, in Martin county, before September 1, 1878, and to Jackson in Jackson county, before the end of the year 1879, and to the west line of the state before the end of the year 1880. This company is now engaged in the construction of its line of railroad, and will have the first section from Winnebago city, the present western terminus of the Southern Minnesota Railway, to Fairmont, completed and in operation on or about June 30th of the present year, and it is the intention of the company to continue its line to Jackson without delay, reaching that point before the end of the year, and to complete its road to the west line of the state during the year 1879,—a year in advance of the time fixed by the legislature. On the completion of its line to Jackson, this company will have become entitled, under the before-mentioned acts of congress and of the state legislature, to about 40,000 acres of land in Martin and Jackson counties; but until the lands are absolutely conveyed by the United States to the state of Minnesota, and by the state to this company, there will remain a doubt as to the eventual acquirement of the lands by the company,—a doubt based on the fear that some technicality may cause the lands to be withheld by the general government; and while the company, in the belief that it will secure an unquestionable title to the lands at an early day, is in good faith complying with the terms of the several acts relating thereto, it should be clearly understood by all persons desiring to settle on the lands under the terms herein proposed, that the company may possibly fail to secure a title, and that in such event settlers will be obliged to protect themselves by pre-emption or homestead laws, or otherwise.

Until the company secures unquestionable title to the lands they will not be sold or contracted to persons who are not entitled to the right of pre-emption or homestead under the laws of the United States, because others would be unable to protect themselves in case of the reversion of the lands to the government. In order that the settlement of the lands may not be delayed, the land commissioner of the company will issue permits to parties desiring to enter upon them and commence improvements. These permits will entitle the parties to the lands from the company on the terms herein proposed, on its securing titles thereto, on condition that they shall, in good faith, commence improvements at once, and shall put under cultivation, within 12 months from the date of the permit, at least 40 per cent. of the lands taken, and that they shall, within 60 days after receiving notice from the land commissioner of the company that the company has secured title to and is ready to make a formal contract of sale or deed of the lands, make such payments as may then be due on the lands, and execute notes for and mortgages to secure the deferred payments as hereinafter provided. The company reserves the right to revoke, without notice, any permit which may have been issued, in case of non-compliance with these conditions.

In order to secure the immediate settlement and cultivation of these lands, the company offers them at the following very easy terms: The lands will be appraised on the basis of the value of lands similarly situated, with respect to quality, railroad facilities, etc. Payments will, as a rule, be required at the rate of one dollar per acre per annum, with interest on deferred payments at the rate of 7 per cent. per annum, payable annually. Interest will commence from the time when the company becomes entitled to the lands by the construction of its road in accordance with the terms of the grant, and the first payment of principal and interest will be due one year from that time, but no payment of principal or interest will be required until the company is able to convey the lands by warranty deed. Special credits will be given as follows: For all lands broken within 12 months of the date of the permit a credit at the rate of $2.50 per acre of the land broken. For all lands broken within the second twelve months, a credit at the rate of $1.50 per acre of land broken. For all land seeded in grain within 24 months from the date of the permit, an additional credit of 50 cents per acre will be given; but this will not apply to a second seeding of the same land. These credits will

be applied, so far as they will go, on the first payments due on the lands, principal and interest.

Further information may be obtained on application to the undersigned.

JOHN K. BROWN, Land Commissioner, La Crosse, Wis.

SOUTHERN MINNESOTA RAILWAY EXTENSION COMPANY PERMIT.

Mr. Lee Neel is hereby authorized to enter upon and improve the N. W. ¼ of section No. 7, in township No. 102, of range No. 32, in Martin county, Minnesota, in accordance with and subject to the terms and conditions of the foregoing circular, which is hereby made a part of this permit. The price fixed upon the tract described herein is seven (7) dollars per acre.                          JOHN K. BROWN, Land Commissioner.

LA CROSSE, WIS., ——, 187–.

I hereby accept and agree to abide by the terms of the foregoing circular and permit. *Dated July* 20, 1878.                                         LEE NEEL.

The complaint alleges that Lee Neel immediately after the execution and delivery of the above agreement entered into possession of the land described, and duly kept and performed all the conditions and requirements of said agreement, and duly assigned to plaintiff, for a valuable consideration, said agreement and his rights and privileges thereunder.

The answer denies any agreement, denies that Neel immediately went into possession after the delivery to him of the above "permit," and alleges that about July 31, 1878, defendant duly notified said Neel that the defendant never authorized the giving of said "permit" and would not recognize it.

A change of venue was had to Winona county, where the action was tried by *Start,* J., who found among other facts, that the issuance of the "permit" to Neel by the land commissioner of defendant was unauthorized, but, being apparently within the scope of his authority, the issuance was binding upon defendant; that the acceptance of the "permit" was not signed by Neel when it was delivered to him, and that the evidence does not disclose when it was signed, but that defendant had no notice or knowledge that Neel had signed said acceptance till sometime in February or March, 1879; that about August, 1878, before Neel went into possession of said land or did anything under said "permit," he informed the general manager of defendant that he had the permit, and was then informed by the general manager that the land was reserved from sale, that no one had authority to issue a permit for it and that such "permit" would not be recognized by the defendant; that about November, 1878, defend-

v.31—35

ant established a station upon said land and laid out a town (Sherburn) thereon and that improvements were made thereon; that Neel made no claim to said land and did not attempt to enter into possession thereof until after the town was laid out and improvements made, and that sometime in May, 1879, he entered upon a portion of the land against the protest of defendant, and broke about 78 acres· thereof. The court also finds that the defendant revoked said "permit" before Neel ever performed any of the conditions thereof, and that Neel had notice of such revocation.

The court held that plaintiff was not entitled to a specific performance and dismissed the action. Plaintiff moved for judgment on the findings and also for a new trial. Both motions were denied and judgment was entered for defendant. Plaintiff appeals from both orders and from the judgment.

*Berry & Morey, Loyd Barber* and *J. M. Gilman,* for appellant.

The plaintiff is entitled to a decree of specific performance upon the facts as found by the court. The "circular" 'was a written offer of the lands for sale by the company, sufficient to answer the requirements of the statute of frauds, and when accepted by any one in respect to any particular tract of land, a contract was thereby and thereupon consummated which could be enforced whether the promised permit was issued or not. Pomeroy on Contracts, §§ 59–63, 66–94; *Chinnock* v. *Marchioness of Ely,* 4 De G., J. & S. 638; *Mactier* v. *Frith,* 6 Wend. 103; *Boyd* v. *Brickin,* 55 Cal. 427; Browne on Stat. of Frauds, § 378. It was like the case of a reward offered to any one who will do a certain thing. When the thing is done by any one, a contract is thereby consummated between him and the offerer of the reward. *Freeman* v. *City of Boston,* 5 Met. 56; *Loring* v. *City of Boston,* 7 Met. 409.

The permit, when issued, was not a mere offer or license, but was the evidence of a consummated contract. The writing required by the statute of frauds in contracts for the sale of land, need not be signed by the purchaser. *Sons of Temperance* v. *Brown,* 9 Minn. 144, (157;) *Brown* v. *Eaton,* 21 Minn. 409; *Morin* v. *Martz,* 13 Minn. 180, (191;) *Austin* v. *Wacks,* 30 Minn. 335.

The acceptance by Lee Neel of the offer embraced in the circular,

or of the permit when issued, was the consideration for defendant's promise, and constituted a contract mutually binding. *Vassault v. Edwards*, 43 Cal. 458; *Boyd v. Brickin, supra; Old Colony R. Co. v. Evans*, 6 Gray, 25; *Sanborn v. Flagler*, 9 Allen, 474; *Ewins v. Gordon*, 49 N. H. 444; *Finley v. Simpson*, 22 N. J. Law, 311; *Gale v. Nixon*, 6 Cow. 445; *Worrall v. Munn*, 5 N. Y. 229; *Justice v. Lang*, 42 N. Y. 493; *Roget v. Merrit*, 2 Caines, 117; *Woodward v. Harris*, 3 Sandf. 272; *Patchin v. Swift*, 21 Vt. 292; *Lowber v. Connit*, 36 Wis. 176; *Hutchinson v. Chic. & N. W. Ry. Co.*, 37 Wis. 582; *Warner v. Willington*, 3 Drewry, 523. Upon the same principle, where a deed states that the grantee is to pay off an incumbrance, the acceptance of the deed renders him personally liable for such incumbrance. *Halsey v. Reed*, 9 Paige, 446; *Blyer v. Monholland*, 2 Sandf. Ch. 478; *Trotter v. Hughes*, 12 N. Y. 74; *Burr v. Beers*, 24 N. Y. 178; *Bishop v. Douglass*, 25 Wis. 696; *Smith v. Unger*, 5 N. W. Rep. 1069.

Some early cases held that agreements required to be in writing by the statute of frauds formed an exception to the general rule that there must be mutuality of obligation and remedy for specific performance. Browne on Stat. of Frauds, § 366; Pomeroy on Contracts, § 170; *Clason v. Bailey*, 14 John. 484; *In re Hunter*, 1 Edw. Ch. 1. Want of mutuality, however, where it is considered to exist, is no objection to the enforcement of contracts unilateral in form, such as a deed-poll, bond or undertaking. *Jones v. Robbins*, 29 Me. 351; *Barnard v. Lee*, 97 Mass. 92; *Corson v. Mulvany*, 49 Pa. St. 88; *Otway v. Braithwaite*, Finch, 405; *Butler v. Powis*, 2 Col. C. C. 156; *Palmer v. Scott*, 1 Russ. & Myl. 391. Nor to the enforcement of a stipulation in a lease to renew, or to sell and convey at the option of the lessee. *Hall v. Center*, 40 Cal. 63; *Vassault v. Edwards, supra; Souffrain v. McDonald*, 27 Ind. 269; *Maughlin v. Perry*, 35 Md. 352; *Hawralty v. Warren*, 18 N. J. Eq. 124; *Kerr v. Purdy*, 51 N. Y. 629; *Kerr v. Day*, 14 Pa. St. 112; *D'Arras v. Keyser*, 26 Pa. St. 249; *Napier v. Darlington*, 70 Pa. St. 64; *Schroeder v. Gemeinder*, 10 Nev. 355; *Smith & Fleek's Appeal*, 69 Pa. St. 474.

Acceptance of any unilateral contract, offer or proposition, removes the want of mutuality and renders the parties mutually liable. Such

acceptance may be evidenced by bringing an action, or by written or verbal notice, or by any other acts manifesting an intention to enforce the agreement.    Pomeroy on Contract, § 66.

*John W. Cary,* for respondent.

MITCHELL, J.   In the spring of 1878, the defendant, desiring the immediate settlement and improvement of the lands along the line of its railway to which it expected to acquire title under the "land-grant" acts referred to in the complaint, made known to the public the terms upon which it would issue "permits" to persons desiring to enter and settle upon them.    These terms were embodied in the published circular, Exhibit A.    In May, 1878, one Lee Neel (plaintiff's assignor) verbally applied for a "permit" for the land in controversy, upon the terms referred to.    On the twentieth of July, 1878, defendant's land commissioner executed and delivered to Neel a "permit" for this land, of which the circular "A" was made a part.    This permit and circular is lengthy, and we will leave it to be set out in the statement of the case.    A few days after its issue, and before Neel had entered upon the land or had done anything under it, the general manager of defendant informed him that this land had been reserved by the company for its own uses, and that the permit had been issued without authority, and that it would not be recognized by the defendant, and that his (Neel's) claim to the land under it was then and there repudiated.

The point is made by plaintiff that this was an attempted repudiation, and not a revocation.   But we are clear that it was sufficient as a revocation if the defendant then had power to revoke.   The form of the withdrawal of an offer, or the revocation of a license, is not material.    It is sufficient, if, by words or acts, a party clearly indicates that he will no longer consider it as continuing or in force.    The defendant makes the point that it appears that the land commissioner had been instructed not to issue any permit for this tract, and that this permit was issued through fraud or mistake.    But inasmuch as the land commissioner was acting within the general and apparent scope of his agency, and Neel had no knowledge of this special limitation upon his authority, nor of any fraud or mistake in the issue of the permit, his rights could not be affected.    The following spring,

Neel, disregarding this revocation, went on the land and broke up a part of it, against the wishes and express orders of the company.

We shall assume, for the purposes of this decision, that the improvements which he made would have been a full compliance with the terms and conditions of the permit, if it was in force and not revoked. Neel subsequently assigned to plaintiff, who, having tendered payment, brings this action to compel a conveyance of the land. The important question, therefore, is whether defendant had a right to revoke this permit. This, of course, depends upon the further question whether there was at the time a closed and completed *contract* between the parties. If there was, then defendant had no power to revoke or rescind. If, on the other hand, there was a mere offer by defendant, not accepted by Neel, or a mere license, not yet acted upon by him, then it could be recalled at any time before he had accepted and acted upon it by entering upon the land and commencing to improve it.

The permit must be construed as if the written acceptance now attached to it was not there; for it appears that it was not there when the instrument was delivered to Neel, and the fact of its subsequent signature was never communicated to the defendant.

It is elementary that mutuality is essential to any contract; without a consideration there can be no contract. Where the contract is wholly executory—no money paid, or property passed—there must be a mutuality of promises,—a promise for a promise. Cases in which it has been held that, under the statute of frauds, there is not a mutuality of remedies, are not, in theory at least, an exception to this universal rule. In these cases it has always been held that there must be a promise for a promise, good as a consideration at common law; although, because one party has promised in writing and the other only verbally, the former is bound to perform and the latter is not. It is difficult to see how, on principle, a void promise, which is of no benefit to the promisee or injury to the promisor, can constitute a consideration for a contract; but such is the ground on which the cases put it. *Old Colony R. Co* v. *Evans*, 6 Gray, 25.

Now, what was the undertaking or promise on the part of Neel which would constitute a consideration for any promise on the part

of the defendant? for we take it that if there was no promise or agreement on the part of Neel obligating him to go on and improve the land, then there was no contract between the parties, and the defendant was not bound. If it was still entirely optional with Neel whether he would take possession of and improve the land, then the permit was a mere license or offer, which could be revoked at any time before it was acted upon. This, in our opinion, is the crucial test in this case. Of course an "option" contract is valid and can be enforced if there be a consideration for the option. But, inasmuch as Neel paid nothing, if he promised nothing there would be an entire want of consideration in the present case. This permit (of which the circular "A" is a part) is a somewhat peculiar instrument, some of its provisions seeming to look in one direction and others in the opposite. But, taking it as a whole, and construing it in the light of the situation, and in accordance with its apparent object, we are of opinion that it amounts merely to an authority or license to Neel to enter upon and improve the land, with the privilege, in case he does so, of purchasing in case the defendant acquires title. But that there was nothing binding upon him to do this; that he could do so or not as he chose; and if he had refused, the company could not have compelled him to do it, nor maintained an action against him for damages. If this be so, it is decisive of this case, for if there is no mutuality of obligation there was no contract.

The central idea on the part of the company seems to have been the immediate improvement of the lands. To induce this, they gave parties permission to go into possession with the privilege of purchasing on certain conditions. The permit contains no promise on the part of Neel. The instrument does not seem to be framed upon the theory of binding the party to whom it was issued to perform, it being in its whole tenor permissive merely; the company depending solely for its protection upon the fact that the permit would become void or revocable upon failure to comply with its conditions.

We quite agree with plaintiff that it is not necessary for the vendee to sign the memorandum in order to make a contract for the sale of lands binding; that if accepted by the vendee it may be enforced, although only signed by the vendor, and that it is not necessary that

the written memorandum should state or contain the promise on the part of the vendee; that it is sufficient if there was such a promise *in fact,* and that this may be proved by parol. *But the court nowhere finds that Neel ever agreed to enter and improve these lands, and the evidence nowhere discloses any such promise; at least, not an express promise.* If there was any such promise on his part, it must be one which the law would imply from the fact that he applied for and received the permit.

Counsel cites numerous authorities to the point that a party who accepts and adopts a written contract, although unilateral as to its execution, will be bound by its terms. He also says Neel "accepted" this permit and was therefore bound by it. But in what sense did he accept it? In one sense he accepted it when he took it and put it in his pocket. In another sense he may have accepted it as a mere license, which left it optional with himself whether or not he would avail himself of it. In another sense he might have accepted it by agreeing to go on and improve the land in accordance with its terms. Only this last would amount to an acceptance within the meaning of the cases such as would make a completed contract.

A promise by one party is not under all circumstances to be implied from the fact that a promise has been made by another, to which that sought to be implied would be correlative, and so the parties placed under mutual obligations. *Churchward* v. *The Queen,* L. R. 1 Q. B. 173.

Whatever might be the rule in cases where the instrument, although unilateral as to its execution, is mutual in its general scope and objects, and provides for something to be done by each party, yet, in a case like the present, where the instrument is in form as well as fact unilateral, and upon its face a mere license or permit, it will not be presumed *as a matter of law* that there was a promise or undertaking on the part of the other party from the mere fact that the latter applied for and received the instrument. Even if these facts would be some evidence of such a promise, the inference to be drawn from them would be one of *fact* and not of *law*. *Justice* v. *Lang,* 52 N. Y. 323.

The cases cited by plaintiff to the point now under consideration

mostly belong to one of three classes, none of which, in our judgment, reach this case: *First*, those which hold that a grantee who accepts a deed of conveyance is bound by the terms and conditions, as where it provides that he shall pay an incumbrance on the property. *Finley* v. *Simpson*, 22 N. J. Law. 311, is an example of this class. But these are *executed* contracts, supported by a consideration actually received by the grantee. If he accepts the estate conveyed, he must take it subject to all the burdens and conditions imposed by his deed. The *second* class are cases of executory contracts for the sale of real or personal property. Such are the cases of *Vilas* v. *Dickinson*, 13 Wis. 488, and *Hutchinson* v. *Chic. & N. W. Ry. Co.*, 37 Wis. 582. But in most of these it will be found that the instrument, although only executed by one party, was, on its face, mutual in its scope, and provided expressly for something to be done by each party; and in all of them we think it will be found that it appeared from the evidence outside the instrument, either that there was an express promise by the party not signing it to buy or sell, as the case might be, or else that he had received money or accepted possession of the property under the contract. The *third* class are cases where the sole question was raised under the statute of frauds, that where only one party had signed the memorandum the other party was not bound, and hence no mutuality of remedy, and therefore, in fact, no contract. *Old Colony R. Co.* v. *Evans, supra*, and *Mason* v. *Decker*, 72 N. Y. 595, are examples of this class. But in these cases it was never claimed that the statute of frauds did away with the necessity of a consideration. It always appears or is assumed that there was, in fact, a mutuality of promises, although the promise of the party not signing could not have been enforced, because not in writing.

The ground upon which these contracts are held binding upon the party whose promise was in writing, has been already referred to. Whether it is sound need not now be considered.

In *Boyd* v. *Brinckin*, 55 Cal. 427, a circular was issued, as in this case, inviting persons to settle on the lands, and stating that they would be preferred as purchasers. But it appears that the party accepted the offer *by settling on and improving the lands*, and notified the company of his acceptance, and filed an application to purchase.

The facts are somewhat similar in the case of *Perkins* v. *Hadsell*, 50 Ill. 216.

The *dicta* in *Justice* v. *Lang*, 42 N. Y. 493, so much relied on by plaintiff, are much modified, if not entirely repudiated, in the same case, in 52 N. Y. 323, *supra*.

Our conclusion, therefore, is that defendant had at the time power to revoke the "permit." Judgment affirmed.