## In Equity.

## PENOBSCOT LOG DRIVING COMPANY

*vs.*

## WEST BRANCH DRIVING AND RESERVOIR DAM COMPANY et als.

Penobscot.    Opinion December 17, 1906.

*Water Courses.    Detention.    Rights of Dam Company.    Private and Special Laws, 1903, chapter 174, section 15.*

The West Branch Driving and Reservoir Dam Company, the original defendant, was incorporated by an act of the Legislature approved March thirteenth, 1903, chapter 174, Private and Special Laws of 1903.   By its act of incorporation the company was given the right to exercise the power of eminent domain for the purpose of taking certain real estate, dams and other property of the Penobscot Log Driving Company, the plaintiff, and it was therein provided that when the West Branch Company had acquired the property of the old company, enumerated in the act, that "all the powers, rights and privileges of the Penobscot Log Driving Company pertaining to the driving of logs and the improving of the West Branch of the Penobscot River above the head of Shad Pond on said West Branch but not below the head of said Shad Pond shall be and become the powers, rights and privileges of the West Branch Driving and Reservoir Dam Company, and all the duties of said Penobscot Log Driving Company pertaining to the driving of logs between the head of Chesuncook Lake and the head of Shad Pond shall be and become the duties of said West Branch Driving and Reservoir Dam Company which shall thereafter be holden to perform said duties except as modified by the provisions of this act."

Section 10 of the act of incorporation provides in part as follows :  "Said company in any and all dams which may be owned or controlled by it may store water for the use of any mills or machinery which may use West Branch water, subject to the provision that day and night throughout the year the flow of water down the West Branch, so long as there there shall be any stored water shall not be less than two thousand cubic feet per second, measured," etc.

Section 15 of the act of incorporation is in part as follows : "After said West Branch Driving and Reservoir Dam Company shall have delivered the rear of any annual drive of logs into Shad Pond in manner aforesaid it shall allow to flow out of North Twin Dam at such times and at such rates of

discharge as the Penobscot Log Driving Company may request for the purpose of driving said logs to the Penobscot boom of their several places of destination above said boom, water equivalent to the amount of water held back by said dam as now constructed when there is a thirteen foot head at said dam measured from the bottom of the dam, or so much thereof as shall be called for by said Penobscot Log Driving Company for said purpose, and in determining the quantity of water which the Penobscot Log Driving Company shall be entitled to request for driving purposes, the two thousand cubic feet per second specified in section ten shall be considered a part thereof at such times and at such times only as water is being allowed to flow from said dam at the instance and request of the Penobscot Log Driving Company."

The West Branch Company, as contemplated by its charter, destroyed the old dam at North Twin, and substituted therefor a new dam, located a short distance below on the river. While the water which the company was to allow to flow, by the charter, was from this new dam, the amount of water to be allowed to flow was to be measured by " the amount of water held back by said dam as now constructed (that is the old dam) when there is a thirteen foot head at said dam measured from the bottom of the dam."

*Held:* that the thirteen foot head of water at the old dam is to be ascertained by measuring from the bottom of the dam. Not from the flooring of any gates through the dam, nor from the bottom of any part of the structure, nor from the bottom of the superstructure but from the bottom of the whole structure of the dam.

Also, *held:* that to ascertain the amount of water held back by the old dam, when there was a thirteen foot head of water at that dam, measured as provided by said section 15, a measurement must be taken from the bottom of the dam, in the thread of the stream, where the dam rests upon the natural bed of the stream and holds back water by reason of its being immediately above the natural bed of the stream. The equivalent of that amount of water at the old dam must be allowed to flow from the new dam " at such times and at such rates of discharge as the Penobscot Log Driving Company may request for the purpose of driving said logs to the Penobscot boom or their several places of destination above said boom." In determining this quantity of water, the two thousand cubic feet of water per second, which, by section 10 of the act, must be allowed to flow at all times, may be taken into consideration only when it is being allowed to flow from the dam at the instance and request of the Penobscot Log Driving Company.

In equity. On exceptions and appeal by plaintiff. Exceptions not considered. Decree below reserved. Decree in accordance with opinion.

Bill in equity the substance of which appears in the opinion.

Heard before the Justice of the first instance on bill, answers and evidence. After the hearing, the Justice signed and filed a decree dismissing the bill with one bill of costs for the defendant and at the same time filed a memorandum in which he stated that, for reasons therein given, he had made this ruling pro forma, without consideration of the merits of the controversy between the parties. The plaintiff then appealed from this decree to the Law Court as provided by statute, and also took exceptions to certain rulings made on the hearing. The exceptions were not considered.

The case fully appears in the opinion.

*P. H. Gillin and Orville Dewey Baker*, for plaintiff.

*F. H. Appleton, Hugh R. Chaplin, Louis C. Stearns, E. C. Ryder and Charles F. Woodard*, for defendant.

SITTING : WISWELL, C. J., WHITEHOUSE, SAVAGE, POWERS, PEABODY, SPEAR, JJ.

WISWELL, C. J. The West Branch Driving and Reservoir Dam Company, the original defendant, was incorporated by an Act of the Legislature approved March thirteenth, 1903, Chap. 174, Private Laws of 1903. By its act of incorporation the company was given the right to exercise the power of eminent domain for the purpose of taking certain real estate, dams, and other property of the Penobscot Log Driving Company, the complainant, and it was therein provided that when the West Branch Company had acquired the property of the old company, enumerated in the act, that "all the powers, rights and privileges of the Penobscot Log Driving Company pertaining to the driving of logs and the improving of the West Branch of the Penobscot River above the head of Shad Pond on said West Branch but not below the head of said Shad Pond shall be and become the powers, rights and privileges of the West Branch Driving and Reservoir Dam Company, and all the duties of said Penobscot Log Driving Company, pertaining to the driving of logs between the head of Chesuncook Lake and the head of Shad Pond shall be and become the duties of said West Branch Driving and Reservoir Dam Company which shall thereafter be holden to perform said duties except as modified by the provisions of this act."

So·much as is material of section 10 of the act of incorporation is as follows: "Said company in any and all dams which may be owned or controlled by it may store water for the use of any mills or machinery which may use West Branch water, subject to the provision that day and night throughout the year the flow of water down the West Branch, so long as there shall be any stored water, shall not be less than two thousand cubic feet per second, measured" etc.

By section 15 of this act it was provided: "After said West Branch Driving and Reservoir Dam Company shall have delivered the rear of any annual drive of logs into Shad Pond in the manner aforesaid it shall allow to flow out of North Twin Dam at such times and at such rates of discharge as the Penobscot Log Driving Company may request for the purpose of driving said logs to the Penobscot boom or their several places of destination above said boom, water equivalent to the amount of water held back by said dam as now constructed when there is a thirteen foot head at said dam measured from the bottom of the dam, or so much thereof as shall be called for by said Penobscot Log Driving Company for said purpose, and in determining the quantity of water which the Penobscot Log Driving Company shall be entitled to request for driving purposes the two thousand cubic feet per second specified in section ten shall be considered a part thereof at such times and at such times only as water is being allowed to flow from said dam at the instance and request of the Penobscot Log Driving Company."

The defendant corporation was duly organized, accepted its charter, acquired certain property of the plaintiff corporation together with all the powers, rights, privileges and duties of the latter company in relation ·to the driving of logs above the head of Shad Pond on the West Branch of the Penobscot River, but the plaintiff corporation still retained the power and duty of driving all logs from the head of Shad Pond to the Penobscot boom.

In this bill in equity, filed August 15,. 1905, the complainant alleged among other things, and in addition to the facts already stated, that in the exercise of its public powers and duties in the then log driving season of 1905 it was required to drive, and had

accepted and undertaken to drive below Shad Pond a large quantity of logs which had been delivered to it at Shad Pond on or about the fifth day of August ; that it thereby became the duty of the defendant under its charter to allow water to flow out of the North Twin Dam in accordance with the requirement of section fifteen above quoted ; that although the defendant had water stored at its various dams, all available to North Twin Dam, and all within its control, more than sufficient to comply with the requirements of this section, and although requested by the complainant, that the defendant had refused to allow to flow out of the North Twin Dam either the full amount of water to which the complainant was entitled or such parts thereof as the complainant had from time to time demanded, to the great injury of the complainant in the performance of its public duty of completing the drive to the Penobscot boom.   In the prayer for relief the complainant asked for a temporary and permanent injunction to restrain the defendant corporation and its employees from further holding back the waters of the West Branch then or thereafter stored or available to its North Twin Dam, and to command the defendant to allow the water to flow continuously, as requested by the complainant, for its purposes to the full extent described by the defendant's charter.

A preliminary injunction, as prayed for, was shortly after ordered to be issued upon the filing by the complainant of the statutory bond.   On the twenty-sixth of August, 1905, an arrangement was made between the complainant, the defendant and other defendants who had intervened, and reduced to writing, wherein the parties agreed as to the amount of water that should be allowed to flow from the North Twin Dam during the year 1905, and wherein it was also agreed upon the one hand that the plaintiff company should make no claim for damages against the defendant company for its refusal to deliver water from and after the tenth of August up to the date when the water began to be delivered under the terms of the preliminary injunction, and the defendant, and the other corporations which had intervened, upon the other hand, agreed that they would make no claim for damages against the complainant under the statutory injunction bond, or otherwise.

The case came on for final hearing before a Justice of this court on February 15, 1906, when it was claimed upon the part of the defendants that the bill could no longer be sustained since it related wholly to the drive of logs of 1905, and asked for relief only in relation to the logs which the complainant was then engaged in driving to their destination, and because, prior to the time of the hearing that drive had been entirely concluded. Various other objections to the maintenance of the bill were made. Thereupon, and after all of the evidence had been introduced, the complainant offered an amendment to the bill which was allowed by the sitting Justice who ruled that no new answer or demurrer to the amended bill was necessary or would be allowed, which rulings were made subject to the defendant's exceptions.

By this amendment, the bill, which originally related wholly to the 1905 drive, and in which relief was sought with reference to the completion of that drive, became, in substance, and effect one in which was sought a determination of the respective rights and duties of the parties, depending especially upon a construction of the defendant's charter and of section fifteen thereof above quoted. After the hearing the sitting Justice signed and filed a decree dismissing the bill with one bill of costs for the defendants, and at the same time filed a memorandum in which he stated that, for reasons therein given, he had made this ruling pro forma, without a consideration of the merits of the controversy between the parties. The case comes to the Law Court upon the complainant's appeal from this decree.

In view of our conclusion we deem it unnecessary to consider or determine the defendants' exception to the allowance of the amendment, accompanied with the ruling that no new answer would be allowed to the amended bill ; the propriety of a pro forma ruling when a case is heard by a single Justice, or the other objections made by the defendants to the maintenance of the bill as amended. It is sufficient to say that, as to the original bill, that bill might have been properly dismissed, since the whole necessity for the relief sought had terminated prior to the time of the final hearing, and since, by virtue of the agreement between the parties, no question

of damages remained for determination. Upon the other hand we have no question as to the power of this court to take jurisdiction of a bill, the purpose of which is to have judicially ascertained and determined the respective rights and duties of the parties relating to the use of water upon a navigable or floatable stream, when such water has been accumulated by a dam erected under a legislative charter, or otherwise.

Because of our conclusion as to the merits of the controversy, and of the necessity for an early and authoritative determination of the important question involved, we express no opinion as to the propriety of the allowance of an amendment, at that stage of the proceeding, the ruling connected therewith, or as to other objections raised by the defendants, but come to a consideration of the merits of the case, viz; the construction of section fifteen of the defendant's act of incorporation.

Prior to the time of the commencement of this bill, the West Branch Company, as contemplated by its charter, had destroyed the old dam at North Twin, and had substituted therefor a new dam, located a short distance below on the river. While the water which the company was to allow to flow, by the charter, was from this new dam, the amount of water to be allowed to flow was to be measured by "the amount of water held back by said dam as now constructed (that is the old dam) when there is a thirteen foot, head at said dam measured from the bottom of the dam." The complainant's contention is that the standard of measurement of the water to be allowed to flow is a thirteen foot head of, water at the old dam measuring from the bottom of the deep gates through that dam, that the important and principal part of the clause specifying the amount of water to be allowed to flow is the expression, "a thirteen foot head at said dam," in regard to the meaning of which numerous witnesses were called to testify at the hearing, and much is said in regard thereto by counsel in argument. Upon the other hand the contention of the defendants is, that these words are limited and explained by the following language, "measured from the bottom of the dam," that this means the bottom of the whole structure, and that to ascertain the thirteen foot head, referred to in the act, a measurement must be taken from the bottom of the whole dam.

If the act had not contained the words "measured from the bottom of the dam" there might have been considerable question as to precisely what was meant by the expression, "thirteen foot head," because that expression may have different meanings under different conditions and situations. As said by the court in *Cargill* v. *Thompson*, 57 Minn. 534, 59 N. W. 638, that expression is a technical term in hydraulics, and experts might be called to testify as to its meaning, or non-experts, who were acquainted with the meaning with which the term was locally used, might testify in relation thereto. But it must be remembered that the old North Twin Dam was not a power dam, that is, no water wheels were ever operated in immediate connection with that dam. It was built and always used exclusively as a storage dam, which is equally true of the new dam substituted therefor.

Apparently the framers of this act appreciated the difficulty that might arise in the construction of the term, a thirteen foot head of water, and added the following words for the purpose of making certain and readily ascertainable that which otherwise might have been the subject of much doubt and controversy. These words cannot be rejected. Their importance is shown by their connection with the other language of the section. They were evidently adopted for the purpose of explaining precisely what was meant by the words "a thirteen foot head at the dam." They limit that phrase and show precisely what was meant by it and how that head of water was to be ascertained. With these words of limitation and explanation the whole phrase becomes plain and free from ambiguity and doubt to such an extent that no parol evidence as to its meaning, either from experts in hydraulics or others can be effective in changing the plain and obvious meaning of the whole language.

The thirteen foot head of water at the old dam is to be ascertained by measuring from the bottom of the dam. Not from the flooring of any gates through the dam, nor from the bottom of any part of the structure, nor from the bottom of the superstructure but from the bottom of the whole structure of the dam. The lower part of a dam down to the bed of the stream is just as much a part of, and, certainly, as important a part of the dam as is the upper part.

For the purposes of this case the definition given by Webster is as good as any. He thus defines it: "A barrier to prevent the flow of a liquid; especially a bank of earth, or wall of any kind as of masonry or wood, built across a water course, to confine and keep back flowing water." In 12 Cyc. 1193, and in 8 Am. & E. Encyl. of L. 2d. Ed. 700, the definition is given in the same language as follows: "The work or structure raised to obstruct the flow of the water in a river." The lower part of a dam holds back water and obstructs the flow of a stream as well as does the upper part and comes equally within these definitions.

It is of course true that for some dams there may be a foundation laid in the soil under the surface of the bed of the stream or water course, which does not hold back water or obstruct the flow of the stream, because it does not come in contact with the water of the stream, and the only purpose of which is to provide a secure base for the dam itself. No part of such a foundation, below the surface of the bed of the stream, should be considered as a part of the dam, as the word was used in this section, but whatever part of the structure is above the bed of the stream, and does hold back water by coming in contact with the water of the stream is a part of the dam. That this is in accordance with the understanding of the legislature is somewhat confirmed by a further analysis of the section. The standard of measurement is not a thirteen foot head of water at the old dam, but the amount of water held back by that dam when there is a thirteen foot head at such dam, measured from the bottom of the dam. Water in a stream is held back by all parts of the dam in which it comes in contact.

Our construction, then, of this part of this section is this: To ascertain the amount of water held back by the old dam, when there was a thirteen foot head of water at that dam, measured as provided by the section, a measurement must be taken from the bottom of the dam, in the thread of the stream, where the dam rests upon the natural bed of the stream and holds back water by reason of its being immediately above the natural bed of the stream. The equivalent of that amount of water at the old dam must be allowed to flow from the new dam "at such times and at such rates of discharge as the

Penobscot Log Driving Company may request for the purpose of driving said logs to the Penobscot boom or their several places of destination above said boom." In determining this quantity of water, the two thousand cubic feet of water per second, which, by section ten of the act, must be allowed to flow at all times, may be taken into consideration only when it is being allowed to flow from the dam at the instance and request of the Penobscot Log Driving Company.

> *Decree below reversed. Amended bill sustained.*
> *Decree in accordance with the opinion. Costs to*
> *be determined by the Justice who makes the decree.*