C. H. WALKER, Appellant, v. E. H. DWELLE et al., Appellees.

**DEEDS:** Appurtenances—Profit à Prendre. A grant, in a deed to a
1   mill, dam, and land in connection therewith, to take gravel from
    *other* lands of the grantor to repair the said dam, creates an
    incorporeal hereditament, which is appurtenant to the land conveyed, and passes with it under subsequent conveyances.

**DEEDS:** Construction—Profit à Prendre. The exercise of the right
2   in the grantee of land upon which is a mill and dam, to take
    gravel from *other* lands of grantor "to *repair* the dam *now* in
    connection with said grist mill," will be confined to the dam
    existing *at the time the right is granted.*

**WORDS AND PHRASES:** "Repair" and "Reconstruction." "To
3   repair" presupposes the *existence* of the thing to be repaired.
    "To reconstruct" presupposes the *non-existence*, as an entity, of
    the thing to be reconstructed. Where the evidence showed that
    a dam had never been washed out, *held* that the replacing of

decayed timbers with sound ones, replacing gravel washed out, and the building of successive aprons of wood and cement, constitute *repairs*, and not *reconstruction*.

**DEEDS: Recording—Insufficient Index.** An index which shows the section, township, and range of one tract of deeded land does not constitute constructive notice to good-faith purchasers for value, without notice, of land in *another* section, of a right in the grantee to take gravel from the latter land. (Sec. 2935, Code, 1897.)

**DEEDS: Recording—Instrument Affecting Real Estate.** A deed conveying the right to take gravel from the land of another affects real estate, and must be recorded, in order to charge subsequent purchasers of the land.

**LICENSES: Real Property—Profit à Prendre.** A right in a grantee of a mill site and dam to enter upon *other* indefinitely described lands of the grantor and take gravel for repair of the dam will not be construed to contemplate the *unnecessary* destruction of a substantial grove.

*Appeal from Worth District Court.*—C. H. KELLEY, Judge.

JANUARY 16, 1920.

SUIT to quiet the right to use the gravel beneath the surface of a large tract of land and parcels sold therefrom resulted in the dismissal of the petition and the entry of a decree quieting title in the defendants. The plaintiff appeals.—*Affirmed in part; reversed in part.*

*Frank Forbes* and *J. E. Williams,* for appellant.

*Duncan Rule, M. H. Kepler,* and *W. H. Salisbury,* for appellees.

LADD, J.—I. A dam had been constructed across the Shell Rock River, prior to 1871, and a mill erected at the north end of the dam. This was in the northeastern part of the NW¼ NE¼ of Section 32, in Township 100 North, Range 20 West, in Worth County, about 10 rods south of the section line. The property belonged to L.

1. DEEDS: appurtenances: *profit à prendre.*

and A. J. Dwelle, as also did about 125 acres of the SE¼ of Section 29, in the same township. In 1875, the Dwelles conveyed the tract first mentioned, containing about 10.88 acres, to A. N. Nye and J. H. Willing, describing it as in Worth County, "commencing at the southwest corner of Block No. sixty-nine in the village of Northwood, as platted and recorded in the town plat record of Worth County, Iowa; thence south one chain and seventy-three links (1-73 links) to a place of beginning. Thence south 2 degrees east 300 links; thence south 18½ degrees west 295 links; thence south 73 degrees west 600 links; thence south 82½ west 600 links; thence north 61 degrees west 500 links; thence north 30½ west 412 links; thence north 83 degrees east, 1,950 links to the place of beginning, containing ten 88-100 acres more or less according to the survey. Also granting the use of the gravel pit situated north of the gristmill (about thirty-five rods) to repair the dam now in connection with said gristmill; and we, L. and A. J. Dwelle, our assigns or representatives, reserve all and the use of the surplus water of the millpond not used in running the grist- and sawmill and machinery and shall have the privilege to build, maintain and keep in repair a flume leading from the flume occupied by said gristmill and sawmill, and machinery used by said water (power) to propel other machinery situated east of said water (power) wherever located, the whole use of such surplus water."

The covenant of warranty was "against the lawful claims of all persons whomsoever, including the right of flowage for the use of the mill power at the present height of the dam now built." The plaintiff acquired this land through mesne conveyances under Nye and Willing, and in this suit seeks to have established the right perpetually to use gravel for the repair of the dam from the strata of gravel beneath the surface soil of land described as follows:

"Beginning at a point in the southeast quarter of Sec-

tion 29, in Town 100 North, in Range 20 West, 21 rods west of the north and south qr.-qr. line of said section, and 25 rods north of the south line of said section and running thence north 48 rods, thence east 100 rods more or less to the east line of said Section 29, thence north 31 rods, thence west 20 rods, thence north 8 rods, thence east 20 rods, thence north 12 rods, thence west 20 rods, thence north 18 rods, thence east 20 rods, thence north 12 rods, thence west 20 rods, thence north 14 rods to the east and west quarter line, of said Section 29, thence west 140 rods, more or less to the center of said Section 29, thence south 56 rods, thence east 31 rods, thence south 30 rods, thence west 31 rods, thence south 51 rods, thence east 59 rods to place of beginning."

The grant of "the use of the gravel pit to repair the dam now in connection with the said gristmill" gave the grantee the right to remove the gravel from the pit; for in no other beneficial manner might the pit be used. The grant of the right to take gravel from the pit is what is denominated in law as *profit à prendre,* and is the right to take a part of the soil or the produce of the land. *Pierce v. Keator,* 70 N. Y. 419 (26 Am. Rep. 612); *Ladd v. Smith,* 107 Ala. 506. This right, when attached to another estate, is in the nature of an easement, but not technically such. In Goddard's Law of Easements, page 6, the author points out that:

"An easement is a privilege without profit; a right by which one person is entitled to remove and appropriate for his own use, any part of the soil belonging to another man, or anything growing in or attached to, or subsisting upon his land, for the purpose of the profit to be gained from the property thereby acquired in the thing removed, has always been considered in law a different species of right from an easement, and is commonly called a *profit à prendre.*"

Thus, it has been held that a right to take stones from the land of another to mend roads, is *profit à prendre,* and

not an easement. *Constable v. Nicholson,* 14 C. B. Rep. (N. S.) 229. So, too, of the right to turn cattle into a lane for the purpose of obtaining pasture, and "to enter land and to cut and carry away trees there growing." The rule is otherwise concerning water unconfined, for the reason that it is not a product of the soil, and not a permanent part thereof.

"This right of *profit à prendre,*" as said in Washburn on Easements (4th Ed.), Section 7, "if enjoyed by reason of holding certain other estate, is regarded in the light of an easement appurtenant to an estate; whereas, if it belongs to an individual, distinct from any ownership of other lands, it takes the character of an interest or estate in the land itself, rather than that of a proper easement in or out of the same."

"Rights to take profits from another's land may exist in gross,—that is, they may be held by one independently of his ownership of other land, the rule in this respect differing from that usually regarded as applying to easements, unattended with a right of profit. They may, however, be appurtenant to other land, the land to which the right appertains being then the 'dominant tenement,' and the land from which the profits are taken being the 'servient tenement.' A right of profit, in order that it may be appurtenant to other land, and pass therewith, must be such as to be in some way connected with the enjoyment of the right of property in the dominant tenement, and must be limited by the needs of the latter." 1 Tiffany on Real Property, Section 336.

In *Grubb v. Grubb,* 74 Pa. St. 25, Judge Agnew, in the course of his opinion, observed that:

"A right of *profit à prendre,* which may be held apart from the possession of land, differs therein from an easement, which requires a dominant tenement for its existence. Bainb. Mines, Ed. 1871, p. 237. But a right of *profit à*

*prendre,* if enjoyed by reason of holding another estate, is regarded in the light of an easement appurtenant to such other estate.   Washb. Easem., Ed. 1863, p. 7.   And, says Mr. Justice Strong, in *Huff v. McCauley,* supra, 209, some modern decisions have called it an easement, though it was a privilege on another man's land with profit; and he refers to *Ritger v. Parker,* 8 Cush. 145, and *Post v. Pearsall,* 22 Wend. 425.   It is immaterial, however, whether we call it an easement or a right of *profit à prendre* annexed to land. It is the same in nature, and is such a right as can be annexed to other land by express grant, and will pass as appurtenant to it.   Even land itself, under some circumstances, may be so annexed to other land as to pass as an appurtenant.   *Murphy v. Campbell,* 4 Barr 480, 484-5; *Swartz v. Swartz,* Id. 353; *Cope v. Grant,* 7 Id. 488; *Blain's Lessee v. Chambers,* 1 S. & R. 169; *Pickering v. Stapler,* 5 S. & R. 107; *Hill v. West,* 4 Yeates 142, 146; *Grubb v. Guilford,* 4 Watts 244.   In this case, the right is incorporeal, not being a grant of the ore in place, but for a mere right to dig and take it away for a special use, and is clearly annexed to the Mount Hope estate by express terms."

Here, the grant of the use of the gravel pit was as distinctly conveyed for the consideration paid as was the land described, which included the mill site and clearly was appurtenant thereto.   Its use was limited to the repair of the dam there located.   Jones on Easements, Section 50.   In other words, the right to take gravel could be exercised only for the benefit of the particular estate described, and only as prescribed.   The grant, then, created an incorporeal hereditament, appurtenant to the estate to which it was annexed, and passed with it under the different conveyances.   See, as bearing thereon, *Phillips v. Rhodes,* 7 Metc. (Mass.) 322; *Grubb v. Grubb,* 74 Pa. St. 25; *Huntington v. Asher,* 96 N. Y. 604 (48 Am. Rep. 652).   In this last case, A, being the owner of land upon which was a millpond, con-

veyed to B a half acre of land adjoining the millpond, and the right to take ice from the pond, with the right and privilege of access for that purpose to and from the pond to the icehouse to be located on the lot conveyed. The grantee covenanted to furnish the grantor, as long as he occupied his then residence, all the ice he required for family use, and to furnish to the purchaser of the pond and mill the privilege of taking the ice required for his family use. It appears that the land was purchased by B for the declared purpose of erecting an icehouse, in which to store the ice to be cut from the pond. B sold the half acre so bought to the defendant. The plaintiff sought to restrain the defendant from entering upon the property and exercising a right to cut the ice, under the clause already set out. It was held that the privilege granted was not a license, but was a right to *profit à prendre,* appurtenant to the half acre sold, and that it passed to the defendant, as successor in title of B.

In *Hopper v. Herring,* 75 N. J. L. 212 (67 Atl. 714), Abraham and John Demorest were owners of a tract of land in common. In 1807, they partitioned it, each conveying to the other his one-half interest in the tract in severalty. One of the division lines between these tracts was Pass Kack Brook, upon which was a sawmill and millpond. The mill and all or part of the pond, were upon the land conveyed to Abraham, and in the deed from John to Abraham was this clause:

"The privilege and liberty to get gravel from the west side of the mill dam to keep the same in repair is also granted in this deed to the possessor of the mill."

The west side of the milldam belonged to the part conveyed to John. In pursuance of this deed, the defendant, holding title under Abraham, entered the land of plaintiff, who held title under John, and took the gravel. On this state of facts, the circuit court awarded judgment for the value thereof; but the judgment was reversed on appeal,

the court holding that "It is entirely settled in all the cases that a right like the one now in question is not revocable, and is attached to and passes with the dominant tenement."

The case is much like that now before us, and in harmony with the decisions generally; and we conclude that the grant was of "a right of common," as formerly designated, or *profit à prendre,* appurtenant to the land

2. DEEDS: construction: *profit à prendre.*

granted, and constituted an incorporeal hereditament, appurtenant to the estate on which the mill dam was located. *Stockbridge Iron Co. v. Hudson Iron Co.,* 107 Mass 290; *Harlow v. Lake Superior Iron Co.,* 36 Mich. 105; *Silsby v. Trotter,* 29 N. J. Eq. 228; *Funk v. Haldeman,* 53 Pa. St. 229. The purpose for which the pit was to be used is clearly designated: "to repair the dam now in connection with the gristmill." The word "dam," as here employed, means the structure extending across the Shell Rock River, by which the water is so obstructed and turned into a millrace as to supply power for the operation of the flour and sawmill. The water in the river is thereby obstructed, and turned into a millrace. Webster defines the word as:

"A barrier to prevent the flow of a liquid; especially, a bank of earth or wall of any kind, as of masonry or wood, built across a watercourse to confine and keep back flowing water."

The Supreme Court of Kentucky, in *Paris Mill. Co. v. Paris Water Co.,* 71 S. W. 513, defined a dam as "a structure across a stream, including the abutment on the side next to the mill." See, also, *Penobscot Log Driv. Co. v. West Branch D. & R. D. Co.,* 102 Me. 263 (66 Atl. 542); *Morton v. Oregon Short Line R. Co.,* 48 Ore. 444 (7 L. R. A. [N. S.] 344, 120 Am. St. 827). Though ordinarily a barrier built across a watercourse to confine and keep back flowing water, the physical structure is not always intended,

in using the word "dam." As was observed in *Hutchinson v. Chicago & N. W. R. Co.*, 37 Wis. 582:

"We sometimes hear of fishing or bathing in a dam; and often the water in a dam, meaning in the pond. So, a pond is made to include the dam, even in judicial phrase. *Jackson v. Vermilyea*, 6 Cow. 677. And grant of a dam is held to include an easement in the pond. *Maddox v. Goddard*, 3 Shepley 218."

See, also, *Natoma W. & M. Co. v. Hancock*, 101 Cal. 42 (31 Pac. 112); *Colwell v. May's L. W. P. Co.*, 19 N. J. Eq. 245. One of Webster's definitions is:

"A body of water confined or held by a dam; a mill pond." Any doubt there might exist as to the sense in which "dam" was used in the deed, is disposed of by the context. The use to be made of the gravel pit is "to repair the dam." "To repair" presupposes something in existence, upon which to operate. A body of water might be restored, or another body of water replace it, but it could hardly be repaired with gravel. The clause, "Now in connection with said gristmill," is descriptive of the then location of the dam. By "now" is meant, "at the present time," and "in connection with the gristmill" doubtless refers to its use in holding back the water for the operation of the mill. The dam then there was the one intended, for which provision for repair was being made, and the use of the gravel pit was to repair the then existing dam. Appellee argues that the clause has reference, not to any particular physical structure, but to such a dam as was or should be necessary to the enjoyment of the premises for the purposes for which they were intended to be used. In other words, his contention is that gravel was to be used for the repair of a dam, employing the word in a general sense, in that locality, and that no particular dam was intended. If so, the parties to the instrument were not fortunate in the use of language; for surely it may fairly be construed as identifying the very dam then in

existence. The purpose for which the gravel pit is to be used tends to strengthen the construction mentioned. To repair, according to lexicographers, means to mend, add to, or make over; to restore to a sound condition, after decay, waste, injury, or partial destruction. *Woodbury County v. William Tackaberry Co.*, 166 Iowa 642. Repair is restoration by renewal or replacement of subsidiary parts of the old. Renewal, as distinguished from repair, is reconstruction of the entirety, meaning, by the entirety, not necessarily the whole subject-matter under discussion. The distinction between repair and reconstruction was clearly drawn by Gaynor, J., in *Fuchs v. City of Cedar Rapids*, 158 Iowa 392:

"To 'repair' presupposes the existence of the thing to be repaired. Thus, we say the thing needs repairing; the thing is out of repair; and so, when we speak of repairs, we assume that the thing to be repaired is in existence, and the word 'repair' contemplates an existing structure or thing which has become imperfect by reason of an action of the elements, or otherwise; and, when we repair, we restore to a sound or good state, after decay, waste, injury, or partial destruction, the existing structure or thing which needs to be restored to its original condition; or, in other words, we supply, in the original existing structure, that which is lost or destroyed, and thereby restore it to the condition in which it originally existed, as near as may be. Reconstruction presupposes the nonexistence of the thing to be reconstructed, as an entity; that the thing, before existing, has lost its entity; and 'reconstruction' is defined as follows: 'To construct again; to rebuild; to restore again as an entity the thing which was lost or destroyed;' and it is apparent that the legislature meant, by the word 'reconstruct,' to rebuild (that is, to construct again the thing which, as an entity, has been lost or destroyed); and the fact that, in reconstruction, some of the material or parts

which entered into the composition of the original entity are used does not deprive it of its designation of a reconstructed thing. To illustrate: If a house is completely torn down, and its entity as a house destroyed, the fact that no material was used in rebuilding, except what had formerly been in the building, as originally constructed, would not justify one in saying, wishing to speak correctly, that the house was repaired, but rather that it was rebuilt, or reconstructed."

See, also, *Farraher v. City of Keokuk,* 111 Iowa 310; *Clark v. Martin,* 182 Iowa 811; *Ellyson v. City of Des Moines,* 179 Iowa 882. We have no difficulty in reaching the conclusion that the dam then existing was that for which the gravel pit might be used for the purposes of repair.

II. The defendants contend that the dam existing when the conveyance in 1875 was made, has been destroyed, and that the dam now existing has since been constructed in its stead. If this were true, then, as the gravel pit was to be used only for the repair of that particular dam, all right to the use of the gravel pit has ceased. In other words, the right to the *profit à prendre,* being appurtenant to the particular dam, ceased with the destruction of that dam. This principle has been frequently applied where a party claimed an easement in a building, coupled with no interest in the soil, and it has been uniformly held that the destruction of the building terminates the easement. *Reynolds v. Union Sav. Bank,* 155 Iowa 519; *Brechet v. Johnson Hardware Co.,* 139 Minn. 436 (166 N. W. 1070) ; *Shirley v. Crabb,* 138 Ind. 200 (46 Am. St. 376) ; *Hahn v. Baker Lodge, No. 47,* 21 Ore. 30. See, as applied to right of way, *Chicago, & N. W. R .Co. v. Sioux City Stock Yards Co.,* 176 Iowa 659, 689. But the evidence fails to show the destruction of the dam. The gravel pit has been used by the several owners of the dam since 1875, though possibly not always for the

3. WORDS AND PHRASES: "repair" and "reconstruction."

purposes to which restricted in the deed.  The river flows
through the 10.88-acre tract in an easterly direction, and
the mill is on the north side of the stream.  The plaintiff
testified, and it is undisputed, that, at the time L. and A. J.
Dwelle conveyed the property, there was a flume in the dam,
and the mill was over it; that:

"The dam extended 40 or 50 feet west of the northwest
corner of the mill, and extended south and west from the
mill about 150 feet entirely across the stream, and then
continued west on the south bank of the stream, 700 or 800
feet.  The spillway on the dam is on the part running south
from the mill, on the part that extends nearly north and
south.  The spillway did not extend entirely across the
stream from the mill to the south bank.  About 20 or 25 feet
on the north end of the dam next to the mill was an ice
break.  The dam was constructed of logs, gravel, and lum-
ber; the part on the north bank of the river was just gravel.
The north bank of the river, north and west of the mill, is
raised above the water about 2 feet.  The ice break was
constructed of logs, lumber, gravel, and stone.  The logs
were halved together and pointed; wide at the back end;
not exactly to a point, but halved and filled in; the crib
filled with gravel and stone.  The spillway from the ice
break to the south bank was made of logs, lumber, and
gravel.  I have had a little opportunity to see how the logs
were put in.  It looked to me as if they laid up and down
the stream and crosswise of the stream, cribbed up and
filled with gravel and banked up with gravel; with plank
on top of the cribs, slanting up back under the gravel.  On
the south side of the stream, the gravel extended probably
70 or 100 feet west, and on the north side of the stream, 24
or 25 feet.  The log cribbing was covered with plank back
of the spillway.  The plank were slanting down towards
the upper part of the stream.  The part of the dam extend-
ing west on the south bank of the river was constructed of

gravel. The water in the pond above the spillway was about 5 feet above the natural surface of the ground south of the spillway, and the natural surface of the ground sloped upward for a distance of about 500 or 600 feet, until it was as high as the water in the pond. The dam on the south bank of the stream was built from 5 to 8 feet above the water in the pond, when the water was level with the top of the spillway."

The witness testified that Exhibit B, though without measurements, correctly represents a cross section of the dam, as originally constructed:

Cross Section of Dam Through Spillway as it Was in 1875.

On cross-examination, the witness swore that the dam had not gone out since he came to Northwood, in 1871; that the dam had lowered some, but had never been washed out.

"When I repaired the dam, the propping washed out in a certain place: that is, let it drop down 3 or 4 feet at the upper end. The whole middle part of the dam did not go out;" that Nye and Willing had repaired the dam by putting "a kind of a plank apron over the east side. * * * The apron they put on was of plank. It was made of planking laid flatwise around in cribs, and the back end of the apron was filled with plank on top of each other. The front was of flat plank, set back 2 inches every time they were laid on. * * * Nothing was done to the heavy timbering of the dam at that time. The apron was built of itself under

the dam. The timbers and gravel and stuff behind and back of it gave strength. I don't think there were any timbers driven in to which this apron was nailed. I don't think the apron was spiked to the timbers. Gravel and stuff was put in on the back side, where the ends of the timbers had rotted off. It was connected with the main dam with gravel. There was no physical connection, such as bolts, nails, or spikes, unless it was in the top. On the top, the boards went back to the dam. The boards were there; I saw them. The planking on top was put back on top. * * * I think I distinctly remember that they didn't take off the top planking when they made the new apron, but left the old planking and spilled that onto it. * * * Some of the old stuff on the under side was rotted. On the under side, they took out the rotted part. That is what made them put a new front part under to protect the dam. After they took out the front part, all of the dam was left, except where the logs came out, and the gravel and timber was left. Another owner, Horton, put on timber, lumber, and gravel. He put on another apron, on top of the one that had been put on by Nye and Willing; put in timbers, and then put in boards, that went up and down with the stream. He shot crosswise, and put planking down; made an apron on top of this other apron that got in bad shape, I would say. He did not replace any old timbers with new; just made a whole new concern clear across; made a whole new apron."

Exhibit D, which was identified as a fair representation of a cross-section, when compared with Exhibit B, illustrates precisely what was placed in front of and against the dam to strengthen it.

Cross Section of Dam through Spillway as it was in 1905,
Showing Outlines of Cement Apron Built by Plaintiff.

The dam, as it had previously existed, remained as originally constructed. A log, which had decayed, may have been replaced by another, or gravel had replaced what had washed out; but such changes were made by way of repair. The successive aprons with the gravel underlying cannot be said to constitute a new dam. They were not such, and, at the most, might be regarded as additions to the old one. The same must be said of the concrete apron, replacing those made of plank. The plaintiff replaced the plank with concrete in 1907. A concrete abutment or ice break was constructed on the north side in 1910, and, at some time, a stone wall along the south side of the river. Between these two, the dam, 120 feet long, remains, with the cement apron, as appears from Exhibit No. 1.

Undoubtedly, the construction of the plank aprons, and, later, that of the concrete, greatly strengthened the original dam; but none of these destroyed its identity. They were, as said, in the nature of additions thereto, or betterments, but not, in any sense, repairs; and, as the dam existing at the time the deed was executed, was not destroyed, the right to *profit à prendre* was not terminated. Nor was there any substantial evidence that the dam, with its additions, was higher than the dam when originally constructed. We reach the conclusion that the original dam continues intact, notwithstanding the additions or betterments, and that the right to take gravel from the gravel pit was not terminated.

III. Though the description in the deed of the mill site, including the dam, does not designate the section, township, and range, these are readily ascertainable from the reference to the plat of Northwood; and the evidence shows that the township is 100 North, Range 20 West of the 5th P. M., and that the 10.88 acres conveyed by L. and A. J Dwelle to Nye and Willing, and, through mesne convey-

4. DEEDS: recording: insufficient index.

ances, to plaintiff, is wholly within Section 32 of the same township. The description of this tract is the same in all the deeds, and appears in the index of the several instruments as "10-88-100 acres in the N½ of NE¼ (and see Record) 16, 500 Sec. 32, Twp. 100, Rng. 20." Seeing the record, however, would not inform the searcher of anything dehors the record, nor would anyone examining the index of deeds conveying land in Section 29 in the same township be required to ascertain at his peril the contents of the deeds relating to lands in some other section. Had these deeds been indexed as conveying right in common or *profit à prendre* in the SE¼ of Section 29, appurtenant to the 10.88 acres in the NE¼ of Section 32, doubtless this would have operated as constructive notice of the dam owner's right to use the gravel pit in the SE¼ of Section 29. But this was not done, and therefore the defendants who purchased separate and distinct parcels of the land in Section 29 of L. and A. J. Dwelle, after the conveyance by them in 1875, took without constructive notice of any of the dam owners' claims to the gravel pit. Nor do we think they were charged with actual notice, though some of them may have known of the location of the gravel pit; for nothing about it or its use indicated that it belonged to any other than the owner of the fee. If the owners of the mill site hauled gravel from the pit, the same is true of the public generally. All they might do was to use it by taking gravel therefrom for the repair of the dam; and for all that appears, their use was not different from that of others who hauled away gravel. Neither the condition of the land nor the manner of using the gravel pit was such as to put anyone on inquiry as to any right to the gravel in the tracts sold out of the NE¼ of Section 29, after the execution of the deed in 1875. As well say that the circumstance that teamsters haul coal from a mine or stone from a quarry charges the

public with notice that some of the teamsters have an in-
terest in the mine or quarry.   Our statute declares that:

"No instrument affecting real estate is of any validity
against subsequent purchasers for a valuable considera-
tion, without notice, unless recorded in the office of the
recorder of the county in which the same lies, as hereinafter
provided." Section 2925 of the Code.

That the deed conveying the incorporeal hereditament
described affected real estate is fully settled by the author-
ities. Jones on Easements, Section 118; *Joy v. St. Louis,*
138 U. S. 1; *Whitney v. Union R. Co.,* 11

5. DEEDS: re-      Gray (Mass.) 359 (71 Am. Dec. 715) ; *Shan-*
cording: in-
strument affect-   *non v. Timm,* 22 Colo. 167 (43 Pac. 1021) ;
ing real estate.
                   *Brewer v. Marshall,* 19 N. J. Eq. 537 (97

Am. Dec. 679). As the instrument was not properly in-
dexed, the purchasers referred to were not charged with con-
structive notice, and we find that they had no actual no-
tice, such as to put them on inquiry. See *Nellis v. Munson,*
108 N. Y. 453 (15 N. E. 739) ; *Treadwell v. Inslee,* 120 N. Y.
458 (24 N. E. 651) ; *Willoughby v. Lawrence,* 116 Ill. 11, 21
(4 N. E. 356) ; *Sellers v. Texas Cent. R. Co.,* 81 Tex. 458
(17 S. W. 32).

IV. No question as to notice could arise between the
parties, and the conveyance of the use of the gravel pit as
between them was valid. Its location might have been

                   somewhat uncertain, but that is certain
6. LICENSES:       which can be so made, and the physical fact
real property:
*profit à pren-*   of the existence of the gravel pit in the land
*dre.*
                   of the grantor at about the place designated,
and the circumstance that there was no other, sufficiently de-
fined its location. By "pit," according to Webster's New
International Dictionary, is meant "a cavity or hole in the
ground, natural or artificial; a large hole from which some
mineral deposit is dug or quarried, as a gravel pit, a stone
pit." A gravel pit is an excavation from which gravel is

removed for some purpose, and the words are so employed in common parlance. In 1875, this pit was but a few rods in diameter, but has since expanded to an area of about two acres. The grant was of a right to use the gravel pit, and this must have meant to remove gravel therefrom. Such removal of necessity enlarged the pit, and the mere fact that it has expanded to a larger area than formerly must have been anticipated by the parties to the deed. The evidence tended to show that the surface of the entire tract was underlaid with gravel at an accessible depth. How much the pit will expand hereafter by the removal of gravel, no one can well foretell, and the period during which the right to *profit à prendre* may be enjoyed is quite as indefinite. All that can now be said is that the plaintiff has the right to take such gravel as may be required to repair the dam from the pit, however much it may expand within the tract of land not disposed of by conveyances alleged to have been received for value, and without notice, actual or constructive. The evidence tended to show that, west of the gravel pit, there is a grove of thrifty trees, varying from six inches to over a foot in diameter, and that these were in existence and of considerable size when the Dwelles made the deed, in 1875. Such timber is regarded as being permanently attached to the soil; and it will not be presumed, in the absence of some showing to the contrary, that the owners, in passing the right to remove gravel from the pit located in the prairie land, intended that such pit should expand to the destruction of timber growing on land apparently set apart for that purpose. The situation is such that gravel in vast quantities may be removed yearly for an indefinite period without disturbing this grove, and, under the record as made, the plaintiff is not entitled to relief as against the portion of the area occupied by such growing timber. Relief prayed should have been granted as to land other than that conveyed to purchasers without notice, and

that occupied as a grove. The cause is remanded, with permission to introduce evidence as to the precise location of the grove of timber, and with direction to enter a decree in harmony with this opinion.—*Affirmed in part; reversed in part.*

WEAVER, C. J., EVANS, PRESTON, and SALINGER, JJ., concur.